```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA
                    PENSACOLA DIVISION
```

UNITED STATES OF AMERICA,

   Plaintiff,

         CASE NO. 3:05cr000025/LAC

vs.

WARD FRANKLIN DEAN

   Defendant.

          /

TRANSCRIPT OF TRIAL
VOLUME I

   The above-entitled matter came on to be heard before

the Honorable Lacey A. Collier, United States District Judge,

in the United States Courthouse, Pensacola, Florida, on the 5th

day of December 2005.


APPEARANCES:

FOR THE GOVERNMENT:   ROBERT G. DAVIES, ESQUIRE
          DAVID L. GOLDBERG, ESQUIRE
          Assistant United States Attorneys
          21 East Garden Street, Suite 400
          Pensacola, Florida 32502

FOR THE DEFENDANT:    LOWELL H. BECRAFT, JR., ESQUIRE
          Law Offices of Lowell A. Becraft, Jr.
          209 Lincoln Street
          Huntsville, Alabama 35801

---

*Gwen B. Kesinger, RPR, FCRR*
*United States Court Reporter*
*One North Palafox Street*
*Pensacola, Florida  32502*

FILED   151

2:11PM 1

                              I N D E X

2    WITNESSES                                            PAGE

3    JOHN W. GRAHAM, III

4      Direct Examination By Mr. Goldberg:                 59
       Cross-Examination By Mr. Becraft:                   67
5      Redirect Examination By Mr. Goldbert:               76

6    WAYNE E. JACKSON

7      Direct Examination By Mr. Davies:                   81

8    CERTIFICATE                                           99

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:11PM 1                    (Court in session.)

2                    (Defendant present.)

3          THE COURT:  All right.  We do have a number of

4    preliminary matters that we need to discuss.  One is your

5    motion to stay the proceedings.

6          MR. BECRAFT:  May it please the Court, can I address

7    the Court from here?

8          THE COURT:  Yes, sir.  For this purpose, yeah.

9          MR. BECRAFT:  Last week -- it was on Thanksgiving

10   Day -- I filed a motion to get the juror questionnaires.  The

11   Court entered an order, the order permitted a representative

12   from the defense to go over to Tallahassee to pick up the juror

13   questionnaires.  There was a lady by the name of Branco that

14   went over to Tallahassee, got there on Friday, and she was --

15   I'm having the copies that she picked up from the clerk's

16   office over there, it looks to me like 150 names.  She asked

17   for both the jurors -- the petite jurors as well as the grand

18   jurors, and attached to the motion is her statement that

19   Beatrice -- I think her name is Miller -- over there in

20   Tallahassee, didn't provide us with the grand jurors.  But

21   based on what we've had over the weekend, we've put together --

22   we've examined the juror questionnaires and we've come up with,

23   you know, three problems that I see, and I think these three

24   problems may also affect the composition of the grand jury in

25   this case, because I would presume if we got in reference to

11:56AM 1  the petite jurors these types of problems, those same types of

2  problems manifest themselves in reference to the grand jury.

3  One of the things that we have -- and this is what's

4  talked about primarily in the brief, although there are several

5  other issues that are not necessarily talked about in the

6  brief.  We have cited this Okiyama case from the Ninth Circuit

7  dealing with the necessity of asking questions and getting some

8  type of an answer from the jurors as to whether or not they

9  have the ability to read, speak, and understand the English

10  language.  We have some of these potential jurors on this

11  petite jury that are from other countries.

12  Some of these people, we have no idea where they were

13  born, which is the second issue.  We've got the question of

14  citizenship and then we have the question of residency in the

15  district.  And we have listed in the motion itself and referred

16  to the separate attachments, the attachments can show you when

17  you'd sit down and look at them, we have a lot of these people

18  that didn't answer any questions about where they were born.

19  And, of course, they have to be a citizen in the United States

20  in order to be a juror.  And then they didn't tell us anything

21  about where they lived, you know, how long they've lived in

22  this district.  And of course, the plan for this district

23  requires that somebody actually live in this district for a

24  year.  In fact, some of these people indicated when they

25  filled out the juror questionnaire that they resided here for

11:56AM 1   less than a year. So that would disqualify them as a juror.

2           I don't know, you know, I regret that this happened

3   kind of late like this. I regret also that we weren't given

4   the information about the grand jurors. If we'd had just the

5   same stuff about the grand jurors that we picked up on Friday,

6   we could probably have this issue completely developed right

7   now and be arguing it. However, I think the statute requires

8   that we raise and decide this issue before voir dire. We're

9   about ready to do that. If we had some way to get the

10   questionnaires regarding the grand jurors, it could be faxed to

11   us, we could examine it and maybe, you know, I would think

12   maybe there is 50 names on the grand jury list. It probably

13   wouldn't take but a couple of hours to review it and see if

14   we'd have a problem with the grand jurors.

15           THE COURT: What do you see as the problem here with

16   the jurors?

17           MR. BECRAFT: The problem I see here is citizenship.

18   Statutorily, they have to be a citizen of the United States.

19   A lot of it -- you know, I can understand -- I can understand

20   what the problem is that the clerk has. You know, they send

21   out these questionnaires and these people come back, and it's

22   quite obvious that some of these people, you know, halfway pay

23   attention to what they are doing.

24           But in any event, I think the examination of the

25   questionnaires must reveal that these people are in fact

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

11:56AM 1    citizens of the United States.   They must reveal the fact that

2    these potential jurors are residents of this district.   And

3    there should be some clear indication that these people, you

4    know, there would be a question asked, can they read and write

5    and understand the English language?   That poses a problem

6    right now because we've got, you know, a lot of people from

7    other countries that are coming into our country, you know,

8    right now.   And, you know, I go over to Atlanta a lot and you

9    see these foreigners everywhere.

10    THE COURT:   Don't we determine that right here today?

11    MR. BECRAFT:   Well, it still doesn't deal with the

12    question and the composition of maybe we can resolve some of

13    these problems during voir dire with this jury.   However, it

14    still doesn't address the question of we asked for and the

15    Court granted access to the grand jury records, which we didn't

16    get on Friday.   So, you know, to me, when I sit down and look

17    at these copies of these juror questionnaires, you know, just

18    in my head, I theorized that the problem that we see right here

19    for the petite jury would also manifest itself in reference to

20    the grand jury and, you know, that raises the very interesting

21    question of what was the citizenship status, what was the

22    residency status of the grand jury that returned this

23    indictment.   You know, if there was a grand jury member that

24    wasn't qualified to sit, then we would have a problem.   And I

25    think we're entitled to, under the act, to, you know, look at

11:57AM 1    the questionnaires and raise that issue.    That's all I have,

2    Your Honor.

3            THE COURT:  Mr. Davies.

4            MR. DAVIES:  Your Honor, first of all, this motion

5    that he's filed includes these juror questionnaires with their

6    addresses and their phone numbers and it's not filed under

7    seal.   I don't understand why he didn't file it under seal.

8    I move that he seal this document.

9            MR. BECRAFT:  I don't know that it necessarily needs

10   to be under seal, but if the Court desires to put it under

11   seal, that's fine with me.

12           THE COURT:  Well, under the privacy act, I suspect

13   that it should be and, therefore, it will be granted that it's

14   sealed.

15           MR. DAVIES:  Your Honor, the motion is not timely.   I

16   mean, this was indicted back in March, and he's had since March

17   to get grand jury records.  This is just a ploy to delay this

18   case.   It's been delayed many times.  He's also had sufficient

19   time to get the petite juorrs -- and also, I'd point out that

20   he mentioned that he filed this motion on Thanksgiving.   I

21   spoke with him last night.  He could have filed this motion

22   this weekend electronically and I would have gotten it.

23   Instead, he brings it in here into court and hands it to me

24   right before the jury is about to come in, the venire is about

25   to come in.  So again, that's shows that it's a ploy.   This

11:57AM 1    motion is not timely, and it should be denied because it's not

2    timely.

3         Also, this isn't a proper challenge, I don't think,

4    under the jury selection act.  I haven't had time to research

5    it because I just got handed the motion.  But the test case in

6    those cases talk about the entire jury wheel.  Like if the

7    clerk in Tallahassee, when they are sending out notices over

8    the years, if they are excluding black people, then the clerk

9    has got a problem.  He's not challenging the entire wheel.

10   He's challenging these venire with these questionnaires.  I

11   mean, he basically, I thought he was going to get the entire

12   wheel from Ms. Spencer, all those records.  He basically just

13   used this to learn who the jury members, the venire panel is

14   going to be a couple days earlier to help with the jury

15   selection, and I'm not even sure you have to submit

16   questionnaires to jurors that are going to come in from a

17   petite jury, like the Court said, you can inquire.  And with

18   regard to the grand jury, the Court always inquires of the

19   grand jurors.  You can make sure that all these jurors that

20   are summoned in today are citizens and residents of the

21   district, read and write and understanding English and take

22   care of all that yourself.  So that's another reason it should

23   be denied.

24        The third reason it should be denied is all of this

25   can be addressed post-trial.  I mean, if there is some problem

11:57AM 1    with the master wheel or some constitutional problem, you know,

2    that doesn't have to be addressed today.  In fact, this is

3    obviously not the government's jury selection system.  It's the

4    Court's.  So if the Court is being accused of

5    unconstitutionality or improper conduct, the clerk of the court

6    should be able to be here to defend themselves.  So for all

7    those, Your Honor, this motion should be denied.

8          THE COURT:  That, Mr. Becraft, is the underlying

9    question that is troubling.  With regard to the grand jury,

10   that this grand jury met how long ago?

11         MR. BECRAFT:  That -- I wouldn't know, Your Honor.  I

12   know the indictment was returned earlier this year.

13         THE COURT:  Well, March 17th of '05, and here we are

14   December of '05.

15         MR. BECRAFT:  And then, Your Honor, we had -- I know

16   that Mr. Cowan was his counsel, and I came in the case in late

17   October.  The Court has seen me come along and appear in this

18   case.

19         THE COURT:  I understand that, but I mean, if -- it

20   can't be something new to test the jury system.

21         MR. BECRAFT:  I understand, Your Honor.

22         THE COURT:  That would have been perhaps seemingly the

23   first thing to be done even in October.  That can't be a new

24   novel idea.  I can see the present jury wheel here today

25   because that doesn't happen until a month or more before.

11:57AM 1      MR. BECRAFT: Your Honor, Thanksgiving Eve, I was

2  doing some research on this issue and I got over on Lois Law

3  and doing some research on it, and I ran across a Tenth Circuit

4  case that held that a defendant had been requested by his

5  lawyer to make the challenge and the Tenth Circuit concluded

6  that it was negligence on the part of the lawyer not to have

7  made the motion at the request of his client. So Dr. Dean is

8  the one that had came up with the idea. You know, he got to

9  thinking about the jurors and considered when he looked at the

10  plan, thought that there may be some problem with the plans and

11  that's the reason why we made the motion, Your Honor.

12      THE COURT: I will admit that I'm not concerned about

13  today's jury because we can resolve all the concerns that you

14  have in the voir dire.

15      All right. What I'm going to ask you for is I need

16  just a few minutes to ponder this. I just received it myself

17  and don't go far. We'll be in recess momentarily.

18      (Recess.)

19      THE COURT: I have had a bit of time to review the

20  motion in more detail, and I'm not concerned with the jurors

21  that we have present here today. We can solve any concerns

22  with the individual jurors in that process. However, the grand

23  jury matter is of a concern. And I will tell you, Mr. Becraft,

24  that I have contacted our people in Tallahassee. And if you

25  want to put it very, very bluntly, their claim is -- and mind

11:57AM 1    you I'm not taking their side --

2             MR. BECRAFT:  Okay.

3             THE COURT:  -- I'm just telling you their claim is --

4    that that is a bold-faced lie, plain and simple.

5             MR. BECRAFT:  I'm just telling you what Ms. Branco

6    told me.

7             THE COURT:  And the only thing that tends me that way

8    is our files are open.  Anybody can go over there and get them,

9    you know, by making the proper appointment and such as that.

10   They are just not secret.  I cannot conceive of the fact that

11   when -- that our clerk's people would in any way care if they

12   got anything they wanted and that's what they tell me their

13   offer was.  They also faxed to me a titled inspection of

14   records, and I'll show it to you, where they both were

15   apparently in conversation with Dr. Dean, advised by phone that

16   he didn't need a copy of the jury plan because it was on the

17   website, and he didn't want a copy of the Court's jury wheel,

18   and then it lists those things that they copied, how many

19   pages, what the cost was and signed by B. C. Williams and

20   Sharon Branco, the agents of Dr. Dean, and they don't make any

21   complaints or any statement that we didn't get grand jury

22   records.  So I don't know where you want to maybe --

23            MR. BECRAFT:  Was there any way that we could get --

24   you know, I would just like the questionnaires for the grand

25   jury.

11:57AM 1    THE COURT:  Well, I don't know what that entails.  I

2 can inquire and see what we're talking about when you say that.

3    MR. BECRAFT:  What's the Court's pleasure about, you

4 know, I would just like to ultimately look at the composition

5 of the grand jury or the panel that was called in for the grand

6 jury who decided this case, their questionnaires.

7    THE COURT:  Well, I don't have any real problem with

8 doing that.  Obviously, I wish it was done two or three months

9 ago.

10    MR. BECRAFT:  I understand, Your Honor.

11    THE COURT:  We have inconvenienced 50 or more people

12 who are sitting down below in the pouring-down rain to get

13 here.  If we can't be ready for them, it's rather shabby

14 treatment from all of us --

15    MR. BECRAFT:  I understand, Your Honor.

16    THE COURT:  -- that after this many months, we can't

17 start a trial on time.  That is very, very disappointing.

18    MR. BECRAFT:  Could I send some people over there to

19 pick it up in Tallahassee?

20    THE COURT:  Well, we could probably do better than

21 that and fax it if I knew what it was.

22    MR. BECRAFT:  I'm assuming that they would be similar

23 to these questionnaires that were provided regarding the petite

24 juors, and that's my assumption.  I don't know how many pages

25 that might be.

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

11:57AM 1    THE COURT:  All right.  Mr. Davies, any comment along

2 the way?

3    MR. DAVIES:  No, Your Honor, just that the record

4 would reflect whatever he's given access, I would like access

5 to also.

6    THE COURT:  I'll pose to you.  In my mind, we can

7 proceed with the trial.

8    MR. DAVIES:  That's the government's position.

9    THE COURT:  However, if they tested the grand jury and

10 found it to be wanting and I happen to agree, then haven't you

11 brought the double jeopardy question to the forefront and into

12 focus?

13    MR. DAVIES:  I don't -- no, I don't think so, Your

14 Honor.  I mean, I think given all the time they've had to get

15 the grand jury records, if there turned out to be a problem

16 with the grand jury, it's -- say, we go to trial this week and

17 he's convicted, and they get the grand jury records and find

18 that there is a problem and they -- and, you know, I think that

19 a retrial would not be barred by the double-jeopardy clause and

20 manifest of necessity and all that if it's like an error in the

21 trial.  If there is an error in this trial, there could be a

22 retrial.  I think that if this was the case where he had

23 gotten the grand jury records in March of 2005, it might be a

24 double jeopardy problem.  I mean, I'm comfortable going to

25 trial, Your Honor, based on that ground, and also based on the

1  ground that I'm confident the clerk selects the grand jury

2  constitutionally.

3          THE COURT:  Well, let me once again pause and go see

4  what the simplest solution might be to the situation.

5          MR. BECRAFT:  Thank you, Your Honor.

6          (Recess.)

7          THE COURT:  I hate to keep bouncing you in and out,

8  but the questionnaires can be here, hopefully, in 15 minutes

9  because they had them all ready Friday for inspection and,

10  therefore, there is no problem in gathering them up.  It's just

11  a matter of making copies and faxing them over.

12          MR. BECRAFT:  All right.  Thank you, Your Honor.

13          THE COURT:  Now, I must say that I'm going to pursue

14  this matter further based upon the reports that I'm getting

15  back.

16          MR. BECRAFT:  Right.

17          THE COURT:  And so if that changes anybody's mind at

18  this point, that would save us a whole hell of a lot of time,

19  too.

20          MR. BECRAFT:  Well, all I know is that people that we

21  asked to go pick them up Friday picked up a part and reported

22  back to us.

23          THE COURT:  I understand that, but I'm saying they

24  submitted an affidavit under oath.  I understand there is two

25  or three witnesses there in the clerk's office.  And as I say,

11:57AM 1  when they tell me no problem, we'll fax them right over because

2  we have them together like we had them Friday causes me a

3  concern.

4  MR. BECRAFT:  I understand that, Your Honor.

5  THE COURT:  So if you have contact with any of those

6  people who signed that affidavit, maybe they can clear up the

7  matter for both you and me real quick.

8  MR. BECRAFT:  I will -- Your Honor, McFarland got word

9  from the clerk's office that he has now been admitted, but what

10  I'd like to do is ask him to contact Ms. Branco and talk to her

11  about this.

12  THE COURT:  That might be advisable.

13  MR. BECRAFT:  All right.

14  THE COURT:  And he certainly would be welcome if he

15  has been admitted.

16  MR. BECRAFT:  He just got admitted.  He'll probably

17  need to take care of this.

18  THE COURT:  All right.  So again, we'll stand down,

19  say, just to make copies and however long it takes the fax

20  machine to work.

21  MR. BECRAFT:  Was the Court's pleasure then to allow

22  us to look at it before?

23  THE COURT:  Yes, sir.  I don't want any question.

24  MR. BECRAFT:  Okay.  I understand.

25  (Recess.)

11:57AM 1           THE COURT:  To just give you an update, it's amazing

2 how slow fax machines are, so we've had them e-mail them over

3 and they are being printed at this moment.  So we'll get those

4 to you very shortly.

5           What I propose to do, though, is to send our jurors

6 away until 1:00, rather than have them just keep hanging

7 around.  We have to interrupt for lunch anyway, so I'd rather

8 not do that in the middle of it, if that's acceptable.

9           MR. BECRAFT:  We're here for -- we'll do whatever the

10 Court wishes.

11           THE COURT:  Well, that's what I'll do then.  We'll

12 send them away with apologies.

13           However, before doing that, let me ask you, you have

14 the questionnaires provided for you, I believe.

15           (Recess.)

16           (Jury selection not requested.)

17           THE COURT:  All right.  Anything we need to talk about

18 before we proceed?

19           MR. BECRAFT:  Could I bring something to the attention

20 of the Court?  I think the Court is aware that my client is

21 very active in his defense, and he wanted me to use -- for the

22 purpose of explaining his arguments, he went to the effort of

23 producing these nice charts, and he's asked me to use them in

24 my opening statement.  So I wanted to show them to the Court

25 and ask if there was any objection.  It kind of summarizes his

3:29PM 1    testimony, Your Honor.

2               THE COURT:  Mr. Davies.

3               MR. DAVIES:  Your Honor, as long as Mr. Becraft

4    understands that I'm not agreeing that they are admissible in

5    evidence.  It's like any other opening convention stuff, but I

6    don't have a problem for them coming for opening.

7               MR. BECRAFT:  That's what it's for, Your Honor.  It

8    helps me.

9               THE COURT:  They will be permitted.

10              MR. DAVIES:  Your Honor, the government would invoke

11   the rule.

12              THE COURT:  All right.  The rule has been invoked.

13   I'm sure I don't have to explain it for either side, and anyone

14   who is expected to be called as a witness in the case will have

15   to remain outside until you are called to testify, and you must

16   not discuss your testimony that you expect to give or intend to

17   give with anyone other than the attorneys and parties to this

18   case.  And I would direct counsel to inform their other

19   witnesses in accordance with the rule and the sanctions that

20   might apply.

21              MR. DAVIES:  Your Honor, for the record, Special Agent

22   Burgess is the case agent.

23              MR. BECRAFT:  I don't have objection.

24              THE COURT:  She will be exempt from the rule.  We'll

25   be in recess until 3:30.

| 3:29PM | 1 | (Recess.) |
| | 2 | THE COURT:  Do we have everyone present? |
| | 3 | Mr. Reed, bring the jury in. |
| | 4 | (Jury present.) |
| | 5 | THE COURT:  We are missing someone, Mr. Reed.  We're |
| | 6 | missing someone.  I'm sorry.  I miscounted.  Go catch him.  I |
| | 7 | miscounted, Mr. Reed.  I'm sorry.  I apologize. |
| | 8 | SECURITY OFFICER:  You looked at the empty seat, did |
| | 9 | you? |
| | 10 | THE COURT:  All right.  Well, we are finally now ready |
| | 11 | to begin with the case of United States of America versus Ward |
| | 12 | Dean, whom you met earlier in the jury selection, represented |
| | 13 | by Mr. Lowell Becraft and Charles McFarland, and for the |
| | 14 | government, Mr. Robert Davies and David Goldberg.  So if you |
| | 15 | would, please stand and be sworn as the jury to hear this case. |
| | 16 | (Jury sworn.) |
| | 17 | THE COURT:  All right.  Ladies and gentlemen, now that |
| | 18 | you have been sworn, I do want to give you some preliminary |
| | 19 | instructions to aid you in your participation in this trial. |
| | 20 | It will be your duty to find from the evidence what the facts |
| | 21 | of the case are.  You and you alone are the judges of the |
| | 22 | facts.  You will then have to apply to those facts the law as I |
| | 23 | explain it to you, and you must follow that law, whether you |
| | 24 | agree with it or not.  And that, of course, is in keeping with |
| | 25 | the oath that you have just taken here today. |

3:36PM 1         I do want you to understand from the very beginning

2    that you must not take anything that I may say or do during

3    this trial as any indication that I have any opinion concerning

4    any of the issues in the case or what your verdict should be.

5    And, therefore, except for my instructions to you on the law,

6    you are to disregard anything that I may say or do during this

7    trial.

8         Now, the evidence from which you may find -- will find

9    the facts from will consist of the testimony of witnesses,

10   documents and other things that might be received into the

11   record and any facts that the attorneys might agree to or

12   stipulate to and any facts that the Court might direct that you

13   are to find.

14        Certain things are not evidence and must not be

15   considered by you.  Statements, arguments and questions by the

16   attorneys are not evidence.  Now, objections to questions are

17   not evidence.

18        Now, it is the duty of the attorneys to make all

19   objections that they feel are necessary and proper.  When they

20   believe that some question that is being asked is contrary to

21   the Rules of Evidence or Rules of Procedure, they would make an

22   objection to that.   The Court would either overrule the

23   objection or sustain the objection.   Now, if the objection is

24   sustained, then the witness will not be permitted to answer the

25   question, and you must not speculate on what that answer might

3:38PM 1    have been or what might have occurred if the objection had not
2    been sustained.

3           Now, if I overrule the objection, then the witness
4    will be permitted to answer, and you must accept and weigh and
5    judge that testimony just as you do the other testimony in the
6    case without regard to the objection or the Court's ruling on
7    the objection.   If you are instructed that some item of
8    evidence is being admitted for a limited purpose only, then you
9    must follow that instruction.

10          Testimony that the Court might exclude or direct that
11   you are to disregard is not evidence and must not be
12   considered.   Now, anything that you may have seen or heard
13   outside of this courtroom is not evidence and must be
14   disregarded.   You are here to decide the case solely on the
15   basis of the evidence presented here in this courtroom during
16   the trial.

17          Now, there are two kinds of evidence.   That is direct
18   and circumstantial evidence.   Now, direct evidence is the
19   direct proof of a fact such as the testimony of an eyewitness,
20   while circumstantial evidence is proof of facts from which you
21   may infer or conclude that other facts exist.   I will give you
22   further instructions on this point, as well as certain others
23   at the end of the presentation of the evidence.   But do keep in
24   mind that you may consider both kinds of evidence, that is,
25   direct and circumstantial, in deciding your verdict.

3:40PM 1    It will be up to you to decide which witnesses to
2 believe and which witnesses not to believe or how much of a
3 witness' testimony to accept or to reject. And, again, I will
4 give you some guidelines for determining the credibility of the
5 witnesses at the conclusion of the presentation of the
6 evidence.

7    As you know, this is a criminal case, and there are
8 three basic rules about a criminal case that you must keep in
9 mind, and I did discuss these with you during your selection
10 process. First, the defendant is presumed innocent until and
11 if proven guilty. The indictment against the defendant brought
12 by the government, which I have here in my hand, is, again,
13 only an accusation. It is nothing more. It is not proof of
14 guilt or anything else. The defendant, therefore, starts out
15 this trial with a clean slate.

16    And, second, the burden of proof is on the government
17 until the very end of the case. The defendant has no burden to
18 prove his innocence or to present any evidence or to testify.
19 And since the defendant has the absolute right to remain
20 silent, the law prohibits you in deciding your verdict from
21 considering that the defendant may not have testified.

22    And, third, the government must prove the defendant's
23 guilt beyond a reasonable doubt. And I will give you further
24 instructions on this later as well. But do bear in mind that
25 in this respect, a criminal case is different than a civil

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

3:41PM 1  case.  And I don't recall if any of you served previously on
2  civil juries, but do recognize that proof beyond a reasonable
3  doubt is a greater or higher burden than that used in the civil
4  case.

5       Now, in this case, the defendant is charged with seven
6  offenses, which, again, we do call counts.  And Counts 1
7  through 6 charge that for the calendar years 1997 through 2002,
8  that the defendant willfully attempted to evade and defeat a
9  substantial portion of the income tax due and owing by him to
10  the United States of America when he well knew and believed
11  that a substantial tax was due and owing.

12       Count 7 charges that the defendant corruptly
13  endeavored to instruct and impede the due administration of the
14  Internal Revenue laws by falsely and fraudulently informing
15  entities that they were under no obligation to comply with
16  lawful summons for documents from the Internal Revenue Service.

17       I will give you detailed instructions on the law and
18  the elements of these offenses at the end of the case, and
19  those instructions will control your deliberations and your
20  decision.

21       Now, just a few words about your conduct as jurors.
22  First, I do instruct you that during the trial, you're not to
23  discuss this case among yourselves or with anyone else or allow
24  them to talk to you about the case or speak of the case in your
25  presence.  Until you retire to the jury room at the end of the

3:43PM 1   case to begin your deliberations, you're simply not to talk

2   about this case at all.

3          Second, do not read, listen or watch any news reports

4   or anything else that might bear upon this case in any way.

5   Now, if anyone should attempt to talk to you about the case or

6   speak of the case in your presence, remind them that you're on

7   the jury, ask them to stop, and should they persist, then leave

8   them at once and report the matter to the security officer as

9   soon as you can.  He will bring it to my attention, and it will

10  be dealt with as a matter of contempt of Court and punished

11  accordingly.

12         Third, do not do any research or make any inquiry on

13  your own about this case.  And, finally, you should not attempt

14  to even form an opinion about the merits of the case until

15  after you have heard all of the evidence, the arguments and

16  received your instructions on the law.  Keep an open mind until

17  you start your deliberations at the end of the case.

18         In that regard, when you come and go in the

19  courthouse, I do direct that you go as directly as you possibly

20  can from the front entrance to the jury room.  Do not tarry

21  along the way or have any conversation with anyone.  Of course,

22  good morning and good afternoon is fine, but no conversation,

23  because you do not know whether you're talking to a witness, an

24  interested party, family member or whatever.  So, please, go as

25  directly as you can to the jury room when you enter the

3:45PM  1   building.

2           In that regard, if you see one of the attorneys, and

3   they do not speak to you or acknowledge your presence, please

4   understand that they are not being rude.  They are simply

5   abiding by the rule and attempting to not have any instance

6   that might indicate any improper conduct on anyone's part.

7           We will begin the trial now, and I do want to tell you

8   briefly how the trial will be conducted.  First, the attorney

9   for the government will make an opening statement, which is

10  simply an outline to help you better understand the evidence

11  that is presented for your consideration.  Following that, the

12  defense has the opportunity of making an opening statement, if

13  he wishes to do so.  After the opening statements, then the

14  government will present its case, call its witnesses, and

15  counsel for the defendant will have an opportunity to

16  cross-examine those witnesses.

17          And following the presentation of the government's

18  case, the defendant then has the opportunity of presenting any

19  witnesses or any evidence that he may wish.  And, again, I do

20  remind you that the defendant is not required to call any

21  witnesses or produce any evidence, but this would be the

22  opportunity for him to do so, if he so chooses.

23          And following the presentation of the evidence, then

24  the attorneys will make their closing arguments to you.  And

25  following that, I would give you your instructions on the law

3:46PM 1   that you must follow in deciding your verdict, and then you

2   would retire to consider that verdict.

3          Now, during your trial, it may be necessary for me to

4   talk to the attorneys out of the hearing of the jury concerning

5   matters of law and trial procedure that are simply not of legal

6   concern to the jury.  That's impossible to predict when such a

7   conference might be necessary or how long it might take, but if

8   I expect it to be just a brief discussion, I'll invite the

9   attorneys to approach the bench here, as we say in our terms,

10  and we'll have that discussion in whispered tones so as not to

11  disturb you.  On the other hand, if I expect a more lengthy

12  discussion to be required, you'll be excused to the comforts of

13  the jury room while we continue with that discussion here in

14  open court.  But I do want to assure you that when such a

15  conference is necessary, that it will be conducted in such a

16  fashion as to utilize as little of your time as might be

17  consistent with a fair and orderly disposition of the question.

18         At this time, the attorneys will have the opportunity

19  to make their opening statements in which they may summarize

20  the facts that they expect to be presented and discuss the

21  issues in the case and perhaps the law that they feel might be

22  applicable.  I do remind you that what the attorneys say in

23  their opening statements, or for that matter at any time during

24  the trial, is not evidence and it is not your instructions on

25  the law, and you should not regard them as such, but they are

3:48PM 1   certainly intended to help you better understand the evidence,

2   the issues and the applicable law, so I do urge your careful

3   attention to them.

4        Our rules provide always that each side has equal

5   opportunity to address the jury, but the rules do provide that

6   the government, since the government has the burden of proof

7   will proceed first.

8        And for that reason and that purpose, I'd call upon

9   Mr. Davies.

10        MR. DAVIES:  Thank you, Your Honor.  May it please the

11   Court, Mr. Becraft, Mr. McFarland.  Ladies and gentlemen of the

12   jury, good afternoon.

13        Again, my name is Robert Davies.  I'm an assistant

14   United States attorney with the United States Attorney's Office

15   here in Pensacola, and I represent the United States of

16   America.  Sitting with me at our table there is David Goldberg.

17   He's also an assistant United States attorney with the United

18   States Attorney's Office here in town.  He will be assisting me

19   during this trial in representing the United States, along with

20   me.

21        Now, as Judge Collier has told you, this is the

22   portion of the trial known as opening statements, and opening

23   statements are a chance for the lawyers to tell you what we

24   believe the evidence in the case will be.  It's like an outline

25   of the evidence.  So as you hear the evidence bit by bit from

3:49PM 1  the witness stand, hopefully, because you've heard this

2  outline, this overview, you'll understand why you're receiving

3  the evidence and where it fits in the grand scheme of things.

4  And the bottom line in this case, ladies and

5  gentlemen, is that the United States is going to prove to you

6  that for the tax years under indictment, 1997 through 2002, the

7  defendant, Ward Dean, committed the crimes of tax evasion, and

8  the United States is going to also prove to you that once the

9  IRS, the Internal Revenue Service, began investigating

10  Mr. Dean's evasion of taxes, the defendant attempted to

11  obstruct the investigation.  In legal terms, the defendant

12  endeavored, tried to impede the due administration of the

13  Internal Revenue laws.

14  Now, Judge Collier, and Judge Collier alone, will

15  instruct you all on the law, but in outlining the evidence, I'm

16  allowed to briefly discuss the law with you.  And I submit that

17  to prove tax evasion, Judge Collier will tell you the

18  government has to show:  First, that the defendant owed

19  substantial income tax in addition to what he said he owed on

20  his tax return, and, second, that the defendant knowingly and

21  willfully attempted to evade or defeat the tax.

22  Now, when most people hear the words "tax evasion" or

23  hear the elements of the crime like I just told you, I submit

24  that they can think about a person concealing some of their

25  money or falsifying expenses and deductions in order to cheat

3:51PM  1   on their taxes and pay less than they really owe.   And

2   certainly that's tax evasion.   It's probably the most common

3   form of tax evasion.   The prosecutions for that type of tax

4   evasion can get kind of complicated trying to follow the money

5   and show all the defendant's secretary activities and the way

6   he hid things.   But this case is not about a thing like that,

7   ladies and gentlemen.   It's far simpler than that.   This is a

8   straightforward case.

9        The evidence will show that the defendant is a person

10   who simply defies the law and refuses to pay income tax.   The

11   evidence will show that in each of the tax years under

12   indictment in this prosecution, 1997 through 2002, the

13   defendant earned over $170,000, and for the six years total, he

14   earned over $1,200,000.   In fact, the evidence will also show

15   that the defendant's earnings even included a Navy pension of

16   over $35,000 a year.   And the evidence will show that for each

17   of the tax years under indictment, the defendant owed over

18   $35,000 in federal income tax.   And for the six years in total,

19   the defendant owed over $300,000 in income tax.

20        Yet, the defendant filed tax returns with basically

21   nothing but zeros on them.   He didn't report the $170,000 plus

22   of income he made.   He said his income was zero.   He didn't

23   report the $35,000 plus of income tax he owed.   He said the

24   income tax he owed was zero.   And, in fact, one year, 2002, the

25   defendant refused to file a tax return at all, even though he

3:52PM 1 earned over $240,000 and owed over $59,000 in income tax.

2 Now, I mentioned that I submit that Judge Collier will
3 tell you all that an element of tax evasion is that the
4 defendant knowingly and willfully attempted to evade the tax
5 that he owed. And along with that, I submit that Judge Collier
6 will instruct you that if the defendant believes in good faith
7 that he paid all the taxes he owed, that's not tax evasion. I
8 submit that you'll see, and you probably already know, there
9 are some portions of the Internal Revenue Code that are
10 complicated, and I submit Judge Collier will instruct you that
11 the good faith defense exists before penalizing taxpayers who
12 make innocent mistakes caused by the complexity of the tax
13 code. Thus, for example, if a person in good faith believes
14 that some unusual source of revenue is not taxable or that a
15 certain expense is deductible expense, and it turns out that
16 even though they checked it out and did their best, that they
17 are wrong, that's not a crime.

18 But as I told you, the evidence will show that this
19 case has nothing to do with good faith. This is a case about a
20 defendant who is earning hundreds of thousands of dollars and
21 defying the law, paying no income tax and a bunch of zeros on
22 his tax return.

23 Now, just let me say that as it is completely the
24 defendant's right, and as it is any defendant's right, the
25 defendant has pled not guilty and requested a trial. And in

3:53PM 1   this trial, as the government should do in any trial, we're

2   going to take the time to establish all the elements of the

3   crimes the defendant committed.  And, frankly, that's probably

4   going to be a little bit boring, and I ask you to bear with us

5   as we present the evidence which will involve going through a

6   lot of documents showing that he earned income and didn't pay

7   tax and things like that to prove the elements of the crime.

8   And I'm going to take a little more time right now to outline

9   all our proof in some detail for you.

10       So at this point, let me first mention that the

11   evidence is going to include some correspondence from the

12   defendant, and I'll submit you'll see from the evidence that

13   the defendant has repeatedly contended that he doesn't have to

14   pay income tax, but obviously the fact that someone repeatedly

15   claims that he thinks he doesn't have to pay income tax doesn't

16   make it true, and it certainly doesn't mean that the person is

17   acting in good faith.  And the United States will present

18   extensive evidence that the defendant is defying the law, not

19   acting in good faith and has been repeatedly told that he has

20   to pay income tax.

21       The evidence will include, first of all, the

22   defendant's tax returns themselves, which, as I said, on those

23   tax returns the defendant made no effort whatsoever to

24   calculate his income or the income tax he owed.  They just say

25   zero income, zero tax owed, pretty much zero anything else.

3:55PM 1          Additionally, the evidence will show that the

2     defendant filed false W-4 forms with his employers.  A W-4 form

3     is the form a person files regarding how much tax should be

4     withheld from your paycheck.  The form says to be exempt from

5     withholding, you have to have no tax liability the year before

6     and expect to have no tax liability for that year.  And the

7     evidence will show that the defendant not once, but repeatedly,

8     filed false W-4 forms in which he stated he was exempt from

9     income tax withholding when he wasn't close to being exempt.

10          The evidence will also show that the defendant had an

11    IRA, an individual retirement account, with one of the

12    companies that employed him.  The company's name was Vitamin

13    Research Products.  And as some of you may know, an IRA, an

14    individual retirement account, lets you put some of your salary

15    in a mutual fund or similar investment, and you don't have to

16    pay tax on that part of your salary, your portion of your IRA,

17    until you retire and start taking money out of the IRA.  Of

18    course, if you close out the individual retirement account

19    before you retire, you have got to pay tax at that time.

20          And the evidence will show that Vitamin Research

21    Products wrote checks to the IRA account, but they gave them to

22    the defendant to put into the IRA mutual fund, which the

23    defendant did for a while.  But then the defendant just started

24    putting checks meant for the individual retirement account into

25    his personal bank account without paying any income tax as he

3:56PM 1  was required to do.

2            On top of that, with regard to the money that went

3  into the IRA, the evidence will show that thereafter the

4  defendant closed out his IRA account, directed the individual

5  retirement company to not withhold any income taxes from the

6  distribution, and then when the defendant got the distribution,

7  he didn't pay any income tax on it, as he was required to do.

8            There will be more evidence.  The evidence will show

9  that the defendant has a website, and on his website he states

10  that his refusal to pay income tax is in large part based on

11  the work of a man named Irwin Schiff.  And I'll suspect you'll

12  hear some evidence about how defiant a person Irwin Schiff is,

13  and how he and the defendant certainly are not acting in good

14  faith.  For example, Irwin Schiff has written books with titles

15  which proclaim to advise people how anyone can stop paying

16  income taxes and likening the federal government to the Mafia.

17            Furthermore, the evidence that the defendant, like any

18  other rational person, knows that he has to pay income taxes

19  will come from the fact that the defendant did pay income taxes

20  for a number of years before he stopped paying income taxes.

21  The defendant even hired an accountant, a man named John

22  Graham, to prepare tax returns for him.  And the evidence will

23  show that the defendant filed the tax returns that John Graham

24  prepared through 1995.  Then, for the 1996 tax return, John

25  Graham, a certified public accountant, attempting to comply

3:57PM 1  with the law that Americans have to pay taxes, prepared a 1996

2  tax return for the defendant.  But in spite of the fact that

3  the defendant's certified public accountant said you owe income

4  tax, here's the tax return you need to file, the defendant

5  filed a tax return which stated he had zero income and owed

6  zero income tax.

7        Then for the tax year 1997, John Graham again prepared

8  a tax return for the defendant and advised him you owe income

9  tax, here's the tax return you need to file.  But the defendant

10  didn't file that return.  Rather the defendant filed a return

11  reporting zero income and zero income tax owed, a blatantly

12  false tax return.  And there will be other evidence from John

13  Graham as well.

14        There will be more evidence.  The evidence will

15  include credit applications filed by the defendant, and you

16  will see that when the defendant wants money from a finance

17  company or a mortgage company, he fills out forms saying he

18  makes over $140,000 in income a year.  So when he wants money

19  from a credit company, he says, oh, yes, I have income well

20  over $100,000 a year, but when he fills out a tax return, the

21  defendant falsely says that his income is zero.

22        The evidence will also include credit reports from the

23  defendant showing that he has taken out a significant amount of

24  loans, which I submit will add further evidence that the

25  defendant is violating the tax laws for the same reason that

3:59PM 1   all people who commit tax fraud do, to keep more money for

2   himself.

3         And, importantly, ladies and gentlemen, the evidence

4   will include numerous notices from the Internal Revenue Service

5   to the defendant telling him that he has to pay income tax.

6   And the evidence will include even a Court order telling him

7   that he has to pay income tax.  But before I get to that, just

8   let me add that I've mentioned correspondence filed by the

9   defendant, and the correspondence in evidence will include well

10  over 100 Freedom of Information Act requests filed by the

11  defendant.  And it's totally proper for a person to make a

12  Freedom of Information Act request, but I submit that the

13  evidence will show that the defendant has attempted to unduly

14  burden the government.

15        And, moreover, the defendant's correspondence, I

16  submit, will show that the defendant ask detailed questions

17  about the law, even about codes on IRS documents.  That is, the

18  evidence will show the defendant knows the law, he's been

19  repeatedly told the law that he, like everybody else, has to

20  pay taxes, but he just keeps pontificating and looking for a

21  way that he can claim to refuse to pay income taxes, taxes that

22  he's been told time and time again he has to pay.

23        And that gets me to still more evidence the United

24  States presents which will show the defendant is defying the

25  law and not acting in good faith.  That's the number of times

4:00PM 1   and places the government has told the defendant that he has to

2   pay income tax.  First of all, the evidence will include the

3   tax returns themselves, basic 1040-EZ and 1040 forms, which,

4   I'm sure you know, has a line to report your income and tell

5   you right on that line that wages and salary and tips count as

6   income.  And the defendant earned wages and salary every year

7   from 1997 to 2002, but he falsely put zeros on that line.

8         Also, we'll put in evidence IRS instruction booklets

9   for the tax years in issue.  And like I said, some parts of the

10  tax code can get kind of complicated, but those books, like the

11  tax return itself, show that there is nothing complicated about

12  the fact that you have got to report your income on your income

13  tax return, and after deductions and exemptions, you have got

14  to pay income tax on your taxable income.

15        You will also see that those instruction booklets have

16  other information that make anyone who reads them realize that

17  Americans have to report income and pay income tax.  And, in

18  fact, the books state that if someone acted in filing as the

19  defendant has acted, then the IRS can impose a $500 penalty for

20  filing a frivolous return.

21        Furthermore, ladies and gentlemen, the evidence will

22  show that when the defendant stopped paying income tax and

23  started filing these fraudulent returns with nothing but zeros

24  on them, and the IRS told and told that -- after he did that,

25  evidence will show that the IRS told and told the defendant

4:01PM  1  that he had to pay income tax and tried and tried to get him to

2  pay.

3         The evidence will show that on October 2nd, 1998, the

4  IRS sent the defendant a letter telling him that he had filed a

5  frivolous 1999 tax return.  Now, the defendant's tax return for

6  1996 was due, of course, on April 15th, 1997.  '96 taxes are

7  due April 15th, '97.  The defendant, though, waited until

8  July 21st, '98 to file his '96 tax return.  And October 2nd,

9  1998, the IRS told him that that was a frivolous return.  That

10  didn't stop the defendant.

11         You'll see that even after getting that notice about

12  his 1996 tax return with zeros being frivolous, the defendant

13  filed a '97 tax return reporting zero income and zero tax owed.

14  The defendant's 1997 tax return was due, of course, on

15  April 15th, 1998.  The defendant filed it March 27th, 1999.

16  And you'll see that the IRS continued to give the defendant

17  notice that he, like any other citizen earning taxable income,

18  had to pay income tax.  Specifically, the evidence will show on

19  August 13th, 1999, the IRS sent the defendant a letter telling

20  him that his 1997 tax return with zeros was a frivolous return.

21         That's not all.  The evidence will show that on

22  June 12th, 2000, the IRS, still simply trying to get the

23  defendant to pay the income tax he owed, wrote the defendant

24  and told him he hadn't filed a correct return.  The IRS also

25  told the defendant in that letter that its job is to administer

4:03PM 1    the law.  It's Congress' job to make laws.  And the IRS told
      2    the defendant it didn't have the resources to respond point by
      3    point to arguments of persons who refused to pay taxes, and the
      4    letter also, again, gave the defendant notice that his
      5    arguments about not having to pay taxes was frivolous and had
      6    been repeatedly rejected by the courts.

      7            After that, however, the defendant continued to badger
      8    the IRS, to refuse to pay the income taxes he owes and to defy
      9    the law, the law that he was put on notice of, the IRS 1040
     10    forms, instruction booklets and letters from the IRS.  But the
     11    evidence will show that even after that, the IRS continued to
     12    send the defendant notices of his obligation to pay income tax.
     13    We'll put into evidence five of the letters from the IRS, that
     14    I won't go through now, telling the defendant that you've got
     15    to pay income tax.  So the evidence will show that the
     16    defendant had notice after notice, and instead of acting in
     17    good faith and paying the income tax he owed, and that he was
     18    repeatedly told that he owed, the defendant continued to defy
     19    the law.

     20            And actually, ladies and gentlemen, the evidence will
     21    show that the IRS did impose a $500 frivolously filing penalty
     22    against the defendant.  And the defendant requested a hearing
     23    regarding that penalty, and the IRS upheld that penalty.  And
     24    the eighth IRS letter in evidence will be this letter telling
     25    the defendant, yet again, that his position is frivolous and

4:04PM  1   upholding the frivolous filing penalty that had been imposed
        2   against the defendant.

        3           But that's still not all the evidence of notice that
        4   you'll receive.  The evidence will show that the defendant
        5   filed a lawsuit in this court, the United States District Court
        6   for the Northern District of Florida, in which the defendant
        7   challenged the IRS's imposition of the frivolous filing penalty
        8   and in which the defendant continued with his meritless claim
        9   that he didn't owe income tax, and that his tax return
       10   reporting zero income and zero tax owed were correct.

       11           And the evidence will show that on October of 2002, a
       12   judge from the United States District Court for the Northern
       13   District of Florida entered an order and told the defendant
       14   that his self-assessment of zero gross income and taxable
       15   income was obviously incorrect.  Furthermore, the judge in this
       16   very court told the defendant that his incorrect information on
       17   his tax returns was due to frivolous justifications.  On top of
       18   that, the judge ruled that the IRS's imposition of the $500
       19   penalty, because the tax return was frivolous, was a valid
       20   penalty.  That's in October of 2002, well before the
       21   defendant's 2002 tax return is due on April 15th, 2003.

       22           Yet even after the defendant received eight notices
       23   from the IRS and an order from a federal judge telling him his
       24   position that he didn't owe taxes was completely wrong, and
       25   after the defendant earned $240,000 of income in 2002,

                      Gwen B. Kesinger, RPR, FCRR
                      United States Court Reporter

4:05PM 1  including earning over \$40,000 from a Navy pension, the

2  defendant refused to file a 2002 tax return, didn't report a

3  dime of income for 2002 or a dime of tax owed for 2002.

4  In sum, ladies and gentlemen, this case -- the

5  evidence will show that this case is about a person that was

6  given opportunity after opportunity to comply with the law, but

7  he chose to defy the law, defy the law and defy the law.  And

8  at the end of the evidence in this case, the United States will

9  ask you to return a verdict finding the defendant guilty for

10  six counts of tax evasion.

11  Now, at this point I need a few more minutes of your

12  time to talk to you about Count 7.  That's the attempting to

13  obstruct the due administration of the Internal Revenue laws

14  count.  The evidence will show that after the defendant had

15  filed a number of false returns and the Internal Revenue

16  Service had tried and tried to get the defendant to file an

17  accurate return and to pay the tax he owed, but the defendant

18  kept refusing to do so, the IRS assigned the matter to a civil

19  IRS revenue agent to investigate it.  The civil revenue agent

20  was named Wayne Jackson.

21  And in January and February of 2002, Revenue Agent

22  Jackson sent out IRS summonses for records to the defendant's

23  primary employer, that company I mentioned before called

24  Vitamin Research Products, and Revenue Agent Jackson sent out

25  summonses to the Navy.  It's actually DFAS, the Defense Finance

4:07PM 1  and Accounting Service, which paid the defendant's Navy

2  pension.  And Revenue Agent Jackson sent summonses to some

3  banks.

4        And Revenue Agent Jackson sent those summonses out in

5  order to obtain documentary proof of the income that the

6  defendant had earned.  And the evidence will show that the

7  defendant attempted to obstruct Wayne Jackson's efforts.

8  Specifically, the evidence will show that when Wayne Jackson

9  sent out a summons, he kept the top copy of the summons.  The

10  middle copy went to the company that was being summonsed, like

11  Vitamin Research Products or DFAS, and the third copy, the

12  bottom, went to the person under investigation, that is, the

13  defendant.

14        And the evidence will show that when he received

15  notices of these summonses, he turned right around and tried to

16  get the people being summonsed, Vitamin Research Products, DFAS

17  and the banks, he tried to get them to not comply with the

18  summonses, and he did so by falsely telling them that the

19  summonses were fraudulent and that they had no obligation to

20  comply with the summonses.

21        Now, as you all know since we're here, the defendant's

22  attempts to obstruct the investigation failed.  The evidence

23  will show that Civil Revenue Agent Jackson eventually got the

24  information he sought.  The matter was referred -- referred to

25  the Internal Revenue Service criminal investigations,

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

4:08PM 1  specifically the criminal investigation Special Agent Tanya

2  Burgess.  You met her during jury selection.

3         After it went to her, it came to my office, the United

4  States Attorney's Office.  After that, it went to the grand

5  jury, who returned the indictment in this case.  These cases do

6  take some time, even without the attempts at obstruction.  But

7  the evidence here will show that there was an attempt at

8  obstruction, which did fail.  But Judge Collier will, I submit,

9  instruct you that it's a crime to endeavor to obstruct, that

10  is, try or -- that is, try or attempt to obstruct the due

11  administration of the Internal Revenue laws, and the evidence

12  will show that the defendant did try to do that.

13         One last thing, just so you don't get caught off guard

14  and surprised, let me mention that one of the first things I

15  plan to do is simply put a lot of documents and records into

16  evidence.  Actually, I'll probably this afternoon just put a

17  couple of sets of documents into evidence and then call a

18  witness, and then later put a number of other documents in

19  evidence.  And that means I'll just stand over there or where

20  Judge Collier would like and basically say Judge Collier, I

21  offer exhibit such and such into evidence.  And the exhibits

22  all have identifying numbers to keep track of these here, like

23  Government Exhibit VRP-1 for the first exhibit from Vitamin

24  Research Products, or Government's Exhibit ITR-1999 for the

25  defendant's income tax return for 1999.  The first time you

4:09PM 1 hear the letters and numbers, they will probably confuse you a
2 little bit. Don't let that bother you. As we go through the
3 trial, you will see what the letters stand for. But anyhow, I
4 want you to know that I'll just basically be calling out a
5 bunch of exhibit numbers at some point in this trial, including
6 exhibits, documents in evidence.

7 I want you to know that before you hear testimony from
8 Wayne Jackson or Tanya Burgess, you'll probably have a couple
9 of parades of records in evidence in this case. And don't let
10 that overwhelm you. For a tax case, that's actually very few
11 records. And the government will publish, that is, show you
12 many of the records during the course of the trial. And, of
13 course, when you retire to deliberate at the end of the case,
14 the records will go back with you, and you can examine them as
15 much as you want. So that's something that doesn't always
16 happen in a trial. That happens more in white color cases, tax
17 cases, and I just want you to know to expect that and not just
18 be confused by it happening.

19 To conclude, ladies and gentlemen, and in sum, the
20 evidence will show that the tax years under indictment, the
21 defendant earned over $1,200,000 income, he earned over -- he
22 owed over $300,000 in income tax and reported nothing but zeros
23 on his tax return or didn't even file a tax return at all. The
24 government told the defendant repeatedly that he had to report
25 his income and pay income tax, but the defendant defiantly

4:10PM 1  refused to do that, refused to comply with the law. And then
       2  on top of that, the defendant attempted to obstruct the IRS's
       3  efforts to investigate his refusal to pay income taxes.

       4          Accordingly, at the end of this case, ladies and
       5  gentlemen, on behalf of the United States, David Goldberg and I
       6  will ask you to return a verdict finding the defendant guilty
       7  of six counts of tax evasion and one count of endeavoring to
       8  impede the due administration of the Internal Revenue laws.

       9          That's my opening statement regarding the evidence you
      10  can expect to receive. Mr. Becraft and Mr. McFarland has an
    · 11  opportunity to give then an opening statement at this time.
      12  Please give them your attention like you did me, and then after
      13  that we will be presenting evidence. Thank you.

      14          THE COURT: Mr. Becraft.

      15          MR. BECRAFT: May it please the Court. Ladies and
      16  gentlemen of the jury, let me reintroduce myself. I'm Larry
      17  Becraft. I'm going to be the attorney that's going to be
      18  representing the defendant in this case. And the defendant is
      19  that man right there in the blue -- stand up, Dr. Dean. That
      20  is Dr. Ward Dean. Seated next to him is Chuck McFarland,
      21  another attorney.

      22          And we are here to defend Dr. Ward Dean and to present
      23  to you the defense in this case to demonstrate that if there is
      24  going to be one thing that the government can't prove in this
      25  case, and this is where the government is going to fail, and

                          Gwen B. Kesinger, RPR, FCRR
                          United States Court Reporter

4:12PM 1  that is that Dr. Dean lacked the criminal intent to violate the
2  law, that he did not have that criminal state of mind, which as
3  the trial goes along, you will learn this is -- we call it
4  willfulness.  It's because Dr. Dean did not act willfully, he
5  didn't commit these crimes.

6  As the Court has previously told you and as Mr. Davies
7  has told you, Dr. Dean has been indicted in this case, and he
8  has pled not guilty.  We're looking at a class -- or basically
9  two different types of crimes that are charged in the
10  indictment.  The first six counts of the indictment allege --
11  charge Dr. Dean committed tax evasion for the year '97 through
12  2002.  The final count, Count No. 7, is this one where Dr. Dean
13  is alleged to have impeded an IRS agent in reference to the
14  summons that Mr. Davies was telling you about just moments ago.

15  The indictment just manifests the charge and just
16  informs him what he's got to defend against.  It's the evidence
17  in this case that the government is going to present which the
18  government anticipates and hopes will persuade you that a crime
19  has been committed.

20  Now, in reference to the crime of tax evasion, the
21  Court will tell you probably several times as the trial goes
22  along, but assuredly at the end of the trial when he gives a
23  jury instruction in this case, the Court is going to tell you
24  about this -- this criminal intent that must be found by you in
25  order to convict Dr. Dean, and that criminal intent is what we

4:14PM 1    call willfulness, that criminal state of mind.  Now, in order
2    to be convicted, the government has got to show that Dr. Dean
3    had this intent to act willfully.  And willfulness, as I'm sure
4    the Court is going to probably tell you, is a voluntary and
5    intentional violation of a known legal duty.  Yet, in this
6    case, Dr. Dean is going to get up there on the stand and he's
7    going to tell you the reasons why he did these things that
8    Mr. Davies just told you about.

9           Let me introduce Dr. Ward Dean to you.  Dr. Ward Dean,
10   he's not somebody that is afraid of controversy.  He's not
11   somebody that is ill prepared or hadn't thought about things.
12   He's a man that's a real scholar.  He's a student.  And he's
13   determined.  A lot of people don't know about the books that
14   Dr. Dean has written.  Here's one.  Now, I'm not so sure I can
15   pronounce the title, "The Neuroendocrine Theory of Aging and
16   Degenerative Disease," Vladimir Dilman and Ward Dean, M.D.,
17   authors; "Vitamin Research News, 2000 Anthology," edited by
18   Ward Dean and Jill English, a book he wrote that proved to be
19   very popular back in the early '90s, "Smart Drugs and
20   Nutrients"; Vitamin Research Products, 2001 Anthology,"
21   authored by Dr. Dean, "Biological Aging Measurements."  So,
22   Ward Dean as an author is somebody that knows how to dig in and
23   do research.

24          Well, let me tell you how he arrived at that point.
25   Dr. Dean was born in California in 1942.  He grew up in

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

1 Stockton, graduated from high school in Stockton, California in
2 1960. From there he attended college for a while before he
3 enrolled in West Point. While he was in West Point, he did
4 everything that everybody anticipates a West Point graduate
5 would do, he studied military history, studied everything about
6 war, be trained as a nation's -- one of our nation's soldiers.
7 He graduated in 1967.

8 After he got out of West Point, let me kind of read
9 you a list, because his career is so varied, so detailed, the
10 only way I can relate it to you is by reading it. He was an
11 airborne -- he went to airborne and ranger school in 1967. He
12 had a tour of duty in Korea from '67 to '69. He was a ranger
13 school instructor in '69 and '70. And he was in Vietnam --
14 Vietnamese language school in 1970 for three months. He had a
15 tour of duty in Vietnam in 1970 and 1971. In 1971 through
16 1973, he was in Korea. Then he went out of the Army and
17 enrolled -- after he learned Korean, he enrolled in a Korean
18 medical school. He attended language school in order to learn
19 Korean. That happened in 1973 and 1974. He attended a Korean
20 medical school in 1974 to 1978. After he got out of medical
21 school, he had an internship in Los Angeles, California during
22 the years 1978 to 1979.

23 Thereafter, he reenlisted into the -- our nation's
24 armed forces, and he became the Navy diving medical officer.
25 He had a course in Washington, D.C. And thereafter, he became

4:19PM 1    a flight surgeon down here in Pensacola in 1980.  During --

2    after that, he went to Korea for two years, from '80 to '82.

3    Then he came back in '82 and he attended the Canadian diving

4    medical officer's school.  And from '82 through '85, he was a

5    flight surgeon for Delta Force.

6         So, Dr. Dean is a man that has served this nation

7    well.  He's a man who follows the West Point motto, "Duty,

8    Honor, Country."  You can ask him what his -- what his favorite

9    statements or phrase is.  On the tip of his tongue will be the

10   cadet prayer, "Help me do the harder right instead of the

11   easier wrong."

12        After Dr. Dean got out of the Delta Force in '85, he

13   went to Los Angeles and established a medical practice.  During

14   the medical -- while he was practicing medicine, he had a lot

15   of patients that were interested in -- you know, out there in

16   LA, they can have a real kind of sophisticated medical market,

17   and there were a lot of people that were interested in, you

18   know, how to improve their brains.  So, he wrote a book like

19   this, "Smart drugs."  It became very popular.

20        But he soon found, having been married and raising a

21   young family, that the environs out there in LA was not what he

22   wanted to raise his children in.  So he made the decision that

23   he'd like to come to Pensacola.  So in 1990, he came back here

24   to Pensacola, and he was a flight surgeon.  He was stationed

25   out at Whiting Field for a while, and he went to mainside and

4:21PM 1  spent five years.  And after those five years, after I think

2  24, 25 years of service to this nation as one of its soldiers,

3  he retired and just became a doctor here in the Panhandle of

4  Florida.  He's written books since that time.  He's got a

5  practice.  I think that practice might be called somebody

6  that's kind of off into alternative medicines, not necessarily

7  pushing pills, a different type of medical practice.

8        So you can't look at Dr. Dean and say that he's some

9  type of slouch or he's got some type of a bad character flaw or

10  he's somebody to be despised, just from his career.  What he

11  has done in the armed forces of this Navy demonstrates that

12  he's an honorable man.  And he's an honorable man even in this

13  fight regarding the income tax.  Let me tell you how he got

14  involved in that fight over the income tax.

15        Now, remember, if you -- one does not act willfully,

16  one does not violate these criminal tax laws if you at least

17  have a frank difference of opinion.  And I think the fairest

18  characterization you can give to this controversy between

19  Dr. Dean and IRS is there is at least a frank difference of

20  opinion.  And I think that you've got to admit that somebody

21  that's been in Delta Force like Dr. Dean, you know, those are

22  the types of guys that build iron wills.  And an iron-willed

23  party, someone with strong beliefs, let me just tell you, they

24  are determined.

25        How did Dr. Dean get to this point?  In about 1990, he

4:23PM 1   sat down and read the Declaration of Independence, the United
2   States Constitution, as he was unpacking as they moved into
3   their house while he was working -- when he was getting ready
4   to go work out at Whiting Field.  That caused him to develop or
5   renew an interest in history.  So he looked around town and saw
6   some used book stores that had some works of Thomas Jefferson,
7   some of the founding fathers, purchased those, sat down and
8   read them, and he became inspired about the history of this --
9   the early history of this nation.

10        Well, as chance would have it, you know, Dr. Dean ran
11   across -- in his quest for looking for old historical works, he
12   bought a number of old historical works that he studied, but
13   one that he ran across was this book called "The Law That
14   Always Was."  He'll tell you today, I think I've forgotten,
15   about '90, '91 or '92, he read this book.  And in this book, he
16   learned something for the first time that a lot of Americans
17   have never learned.  Now, the Court has given me permission
18   to -- you know, I'm kind of sometimes all thumbs, but this
19   right here kind of tells you a little bit -- if I can, a chart
20   that kind of summarizes what Dr. Dean learned by reading that
21   book there.

22        He learned -- he learned something about
23   constitutional taxation.  He learned that pursuant to the
24   Constitution, there is this thing known as direct taxes, and
25   there is another category of taxes called indirect taxes.  And

4:25PM 1  Dr. Dean learned basically what are these types of direct
2  taxes.  You know, taxes -- direct taxes are both on people and
3  property, and these indirect taxes are imposed upon, you know,
4  manufacturing, sale, consumption of commodities, occupational
5  licenses and corporate privileges.  You know, this is his
6  description.  This is what he gives in way of description of
7  these two types of taxes, which he maintains is historical.
8  That's what he learned from Mr. Vernon Holland in this book.
9  And Dr. Dean also learned that the United States Constitution
10  authorized the federal government, the Congress of the United
11  States, to impose both of those types of taxes but under
12  certain types of conditions.  Direct taxes have to be
13  apportioned pursuant to the Constitution.  Indirect taxes have
14  to be uniform.

15       Now, what was interesting from Dr. Dean in this book
16  was, what is an income tax?  An income tax has got to fit
17  within one constitutional category or the other.  And Dr. Dean
18  is going to relate to you what he studied in this book.  You're
19  going to see these red markers -- or yellow markers he's got
20  here.  But he's going to demonstrate and tell for you that, you
21  know, he learned that an income tax has always been a direct
22  tax from the history that -- from the history in Europe, from
23  the history in England and from the colonial history we have
24  here in America.

25       And, in fact, Dr. Dean is going to tell you about, you

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

4:26PM 1    know, how this book talks about a case in 1894, you know, talks
       2    about how there was an income tax that was found to be
       3    unconstitutional because it violated one of these provisions of
       4    the Constitution.  And then Dr. Dean is going to talk to --
       5    learn a little something about the 16th Amendment.  Then he
       6    learned about a Supreme Court case in 1916, which is Brushaber
       7    against Union Pacific Railroad.

       8            Now, I just want to introduce to you what Dr. Dean's
       9    thoughts are in this respect.  And he'll get on the stand and
      10    he'll tell you about those in detail.  But that first work by
      11    Mr. Vern Holland called "The Law That Always Was" was
      12    Dr. Dean's introduction into this topic.  The next book that
      13    Dr. Dean acquired, he -- you know, this would be in the early
      14    '90s when he's traveling around the country speaking to people
      15    about his book, "Smart Drugs," and things of that nature.  He
      16    ran across a book like this called "The Best Kept Secret."  And
      17    in this book, Dr. Dean sits down and -- again, this author,
      18    Otto Skinner, talks about taxes.

      19            You know, Dr. Dean has been educated by Mr. Holland in
      20    this proposition that, you know, today a federal income tax is
      21    an excise tax, but he learned from this book -- and Dr. Dean
      22    also went over to the law library at West Florida and also went
      23    down to the law library downtown -- here downtown and read
      24    cases that said an excise tax is something that can't be
      25    imposed upon somebody's exercise of a right.  So neither one of

4:28 PM 1   these books do anything other than explain to Dr. Dean

2   something about taxes and where they fit in the overall grand

3   scheme of things constitutionally.

4   Well, these two books kind of laid the foundation for

5   a fellow by the name of Irwin Schiff, a fellow that I want to

6   tell you about right now, Mr. Irwin Schiff, a man that's been

7   convicted of tax crimes twice.  And Dr. Dean has read his

8   books, one of which, as Mr. Davies pointed out, is called -- it

9   has this title here, probably an offensive title, "The Federal

10  Mafia."  And Dr. Dean, through his reading of this, became

11  convinced that even though Irwin Schiff has been prosecuted and

12  convicted, Dr. Dean, strong-willed, determined Dr. Dean

13  believes that Irwin Schiff is right.

14  I'll show you this other chart I have got right here.

15  What Irwin Schiff teaches in his book -- and, of course,

16  Dr. Dean has -- this is his second copy of the Internal Revenue

17  Code that Dr. Dean has studied, but what Dr. Dean learned from

18  Irwin Schiff is this:  Irwin Schiff's position is that the

19  government contends that those that are required to file income

20  tax returns are described in the Internal Revenue Code as

21  people -- persons who are liable for a tax.  And what Dr. Dean

22  has done is he's studied, at first, reading Irwin Schiff's

23  book, but, secondly, reading the law himself, and he has

24  reached this conclusion that those that are required to file

25  income tax returns are those that are liable for a tax.

4:31PM 1        And this is what Dr. Dean believes is the statutory
        2  scheme.  Here's a description of the tax, you know, like wine.
        3  He contends that there is a wine tax imposed by a section right
        4  there, and there is a liability statutorily imposed for a wine
        5  tax in that section right there.  And Dr. Dean, student of the
        6  law, even though he's an M.D., he contends that if you define
        7  these statutes right here, you find out where there is a
        8  section of Internal Revenue Code that imposes a tax, you can
        9  find a section where somebody is specifically statutorily made
       10  liable.  And he says that's the way the tax laws operate.  But
       11  in reference to Dr. Dean, he looks at the income tax, and he
       12  sees there is a tax imposed in Section 1 of the code, but what
       13  he comes up with, he contends there is nobody liable for that
       14  tax.

       15        That's the refined essence of Dr. Ward Dean, listens
       16  to a convicted felon, learns this tax argument right here, but
       17  once he turns to the law, once he traipses off down to the law
       18  library over at West Florida and downtown at the county
       19  courthouse, once he does that, he's no longer relying on Irwin
       20  Schiff, but he's relying on the law.  And Dr. Dean is so
       21  convinced that he's right, he's been willing to do what a lot
       22  of people will not do.  You know, there are people -- I've been
       23  over to his house, and I sit there and look at a picture of him
       24  standing there in Granada at the time of the Granada invasion.
       25  I can look around his house and see these military mementos.  I

4:33PM  1   sat out Vietnam.  My number was too high.

2               That man was chomping at the bits to get into West

3   Point.  He's been the type of man that's been chomping at the

4   bits to get everywhere he's wanted to go in life.  He was

5   chomping at the bits to get into medical school, even, you

6   know, to learn Korean and then to attend a Korean school.  If

7   there is anybody that has almost an iron, almost a stubborn

8   will, it's Dr. Ward Dean.  And when he believes in something,

9   when he establishes his mission, if he's going to go to Granada

10  or if he's got to go along on some patrol in Vietnam or

11  something like that, he commits his body and soul to that

12  mission.  He believes in what he does, not 100 percent, not

13  200 percent, but 1,000 percent.  And so when Dr. Dean becomes

14  convinced that he is right, it's not something that's fanciful.

15  It's not something that's drawn out of the wild blue yonder.

16  It's not something that's fabricated.  His beliefs are as real

17  as this podium.  His beliefs are strong.  You can almost touch

18  them.  You can kind of feel them in the air.  Now, he can be

19  wrong, but it doesn't make him a criminal.

20              Oh, somewhere about '85 or '86, Dr. Dean, after he

21  becomes convinced that he has chanced upon something that's

22  important, he decides he's got to carry out this mission.  He

23  sat down with his wife, who is sitting back there, Kumja, she's

24  sitting back there in the courtroom.  They talked about him

25  making a bold step.  Because of his beliefs, he's going to do

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

4:36PM 1    these things.  He's going to file exempt with his various

2    employers.  He's going to say I'm not subject to withholding,

3    and he's going to file tax returns that say zero, and he's

4    going to send that to the government.  He's going to drop us a

5    return.  It's going to have his W-2s attached to it showing

6    what he made.  He's going to put zeros on the returns.  He's

7    going to go exempt.  And he's going to mail it to the IRS.

8    That's somebody that is strong willed and has a commitment.

9         After he gets his wife to at least understand -- I

10   doubt that at that stage his wife could have said anything to

11   stop Ward Dean from doing what he felt like he had to do, he

12   believed it so strongly.  So he started off with this process

13   of, you know, over several years he puts -- he sends in zero

14   tax returns, those zeros.  You're going to see them.  It's got

15   a little cover letter.  The cover letter on his returns kind of

16   explains his position.  You can sit there and you read his

17   letters.  And although you may find fault with them, one thing

18   you've got to understand is that when you look at those

19   letters, you envision the man behind them.  What's his intent?

20        And Ward Dean's intent is this:  He strongly believes

21   that he is absolutely correct, and he wants to demonstrate to

22   the IRS that it is wrong.  And, you know, when you -- when you

23   you're in a situation like that with a strong-willed person --

24   you know, there is a saying in -- when you study logic, you

25   know, you would have logical syllogisms, there is this phrase,

4:38PM 1   you know, what happens when the irresistible force meets

2   the immovable object?  Everything happens.  That's almost kind

3   of like Ms. Burgess and Dr. Dean, strong-willed, Delta Force,

4   Dr. Dean.

5        Sure, Dr. Dean sent in these returns and, sure, the

6   IRS sent back letters, oh, you know, you've got -- we're

7   reading your letter attached to your return, and it's

8   frivolous.  And Dr. Dean comes back and replies, how are my

9   returns frivolous?  And you're going to see all these letters.

10  I just wanted to let you know what's coming up.  And it's at

11  that stage when Dr. Dean starts asking, he asks some very

12  important questions in these letters.  He's asking the IRS this

13  most fundamental question.  He can't -- he -- for this tax

14  imposed in Section 1 of the Internal Revenue Code, the income

15  tax, he can't find a statute that makes him personally

16  statutorily liable for the income tax.  And he asks those

17  questions and gets no reply.

18       Persistently, Dr. Dean just keeps right on going

19  along.  Most people at that stage would usually fold, but not

20  Dr. Dean.  He was committed.  He wanted to know the truth.  The

21  truth was very important for this strong-willed man.  He was

22  tired of bending down.  He believed that he found the truth.

23  He believed that he was absolutely right.  And I think we've

24  all met people like that.  Strong-willed people are right.  And

25  you know sometimes those people can be kind of offensive.  But

4:41PM 1  so what?

2  What you will do in this case is to look at these
3  documents and examine them. You'll see. IRS sends him the
4  letter. He replies. He explains his position as best that he
5  can. And he constantly comes back to this theme, am I a person
6  liable for the federal income tax? Am I a person liable for
7  the federal income tax? Very important question for him that
8  started about '97, '98. He's sending these letters to the IRS.
9  And guess what? He gets no answer.

10  So what's this case about? Wherein will you find
11  reasonable doubt? Well, I kind of suggest you kind of focus
12  your attention on when this evidence comes in about, you know,
13  all these letters, Dr. Dean gets a letter from the IRS, and
14  Dr. Dean replies. Look right in there. It seems like to me
15  that a question of that importance posed by Dr. Ward Dean to
16  the IRS should be answered. And imagine what would have
17  happened if it had been answered? What if an answer to his
18  question had been provided, would we be here in court today? I
19  suggest to you that we wouldn't.

20  And therein, that's the problem with this case.
21  That's the reason why the government can't prove this final
22  element, this third element, this criminal intent element of
23  willfulness, because Dr. Dean -- I've walked with him. And my
24  wife complains that I walk too fast for her. I am taller than
25  he is, and he walks faster than I do. There you have somebody

4:44PM 1  strong willed, the irresistible force meeting the immovable

2  object, Dr. Dean in a contest with the IRS. But, ladies and

3  gentlemen, once the dust settles and you see all the evidence

4  and you hear all the testimony, there is one thing that's going

5  to stand out very boldly in this case, and that is this:  That

6  Dr. Dean did not have the criminal intent necessary to commit

7  these tax crimes.  Thank you, ladies and gentlemen.  Let's

8  start this trial.

9       THE COURT:  All right.  Ladies and gentlemen, this is

10  the time of the trial when the government will present its

11  case.

12       And you may call your first witness.

13       MR. DAVIES:  Your Honor, before we call the first

14  witness, the government would offer into evidence ITR-1997,

15  1998, 1999, 2000 and 2001.  And the government would also offer

16  into evidence Government's Exhibit JG, for John Graham, 1991

17  through John Graham, JG-1997.

18       MR. BECRAFT:  It is my understanding that the exhibit

19  numbers that he read off, Your Honor, are the returns that

20  Mr. Dean filed at the service center, which I presume are

21  certified.

22       MR. DAVIES:  Yes.

23       MR. BECRAFT:  And I have no objection to those.  We

24  have -- Mr. Graham is the next witness, and I think it would be

25  most appropriate if we lay a foundation through the testimony.

4:45 PM  1         MR. DAVIES: Your Honor, Mr. Graham's records have

2  been stipulated to. There is a business records certificate

3  that we filed a pretrial memorandum on. Especially since he

4  stipulated to them, I think he --

5         MR. BECRAFT: That, I wasn't aware, Your Honor.

6         THE COURT: That will be granted, and they will be

7  admitted.

8         MR. DAVIES: Your Honor, if it pleases the Court, the

9  government calls John Graham.

10         JOHN W. GRAHAM, III, GOVERNMENT'S WITNESS.

11         THE CLERK: Do you solemnly swear that the testimony

12  that you shall give will be the truth, the whole truth and

13  nothing but the truth, so help you God?

14         THE WITNESS: I do.

15         THE CLERK: Be seated. State your full name and spell

16  your last name.

17         THE WITNESS: John W. Graham, III. Last name,

18  G-r-a-h-a-m.

19         THE COURT: All right. Mr. Goldberg.

20         MR. GOLDBERG: Thank you, Your Honor.

21                  DIRECT EXAMINATION

22  BY MR. GOLDBERG:

23  Q. Good afternoon, Mr. Graham.

24  A. Good afternoon, sir.

25  Q. Sir, what is your occupation?

4:47PM 1  A.  I'm a certified public accountant in North Carolina.

2  Q.  And how long have you been doing that?

3  A.  Since 1979.

4  Q.  And as a certified public accountant, do you belong to any

5  organizations revolving around the accounting field?

6  A.  I'm a member of American Institute of CPAs and the North

7  Carolina Association of CPAs, sir.

8  Q.  Sir, have you ever had a client by the name of Ward Dean?

9  A.  Yes, sir.

10  Q.  And what were your duties as a CPA for Mr. Ward Dean?

11  A.  I prepared his individual tax returns for several years.

12  Q.  And approximately, could you please tell the ladies and

13  gentlemen of this jury what years those were?

14  A.  1985 to 1987(sic).

15  Q.  And do you handle many military clients in your practice?

16  A.  Yes, sir, a fairly good percentage since I'm from

17  Fayetteville, North Carolina.

18  Q.  And was Mr. Ward Dean in the armed forces?

19  A.  Yes, sir.

20  Q.  Now, you had said that you prepared the income tax returns

21  for Mr. Ward Dean for approximately 12 years.  During those

22  years, who provided the information necessary to you to

23  complete those?

24  A.  Either him or his wife.

25  Q.  Or his wife?  I'm sorry.  You had said that was from about

4:48PM 1  1985 to about 1997?

2  A.  Yes, sir.

3  Q.  And could you please tell the ladies and gentlemen of the

4  jury where exactly his income was generated from?  Was it

5  wages, retirement?  Just a general approximation.

6  A.  Generally, it was wages, because when he was in the

7  military, he had a W-2.  He had a rental property which may

8  have been his house when he was originally in Fayetteville, I

9  don't recall which.  And he also had Schedule C, which is a

10  sole proprietor-type thing.

11  Q.  So he had income records that he provided to you?

12  A.  Yes, sir.

13  Q.  And around 1997, 1998, sometime in the late '90s, did he

14  stop using your services?

15  A.  Yes, sir.

16         MR. GOLDBERG:  Your Honor, may I approach the witness

17  very quickly?

18         THE COURT:  If necessary.

19  BY MR. GOLDBERG:

20  Q.  Sir, I'm going to show you what's been marked as JG-1997,

21  and ask you to take a look at it, just review it, and let me

22  know when you've completed it.

23  A.  Okay.

24         MR. GOLDBERG:  Your Honor, as this has now been

25  entered, JG-1997, I'd like to publish for the jury, if I could

| 4:51PM | 1 | ask for the screen. |
|---|---|---|
| | 2 | THE COURT: Ladies and gentlemen, if you will notice, |
| | 3 | the lights blinked a few minutes ago, and that kicks these sort |
| | 4 | of things off. |
| | 5 | MR. GOLDBERG: Your Honor, is there a way I can have |
| | 6 | that better lit or is it just warming up? |
| | 7 | THE COURT: It's warming up. |
| | 8 | MR. GOLDBERG: Thank you, Your Honor. I apologize. |
| | 9 | May I continue, Your Honor? |
| | 10 | THE COURT: Yes, sir, please. |
| | 11 | BY MR. GOLDBERG: |
| | 12 | Q. Mr. Graham -- |
| | 13 | A. Yes, sir. |
| | 14 | Q. -- I'm going to refer you now to what's been entered as |
| | 15 | JG-1997. That document you just reviewed, do you know what |
| | 16 | that is? |
| | 17 | A. The first page you've got there is my time and billing |
| | 18 | ticket. |
| | 19 | Q. That's your billing ticket? |
| | 20 | A. Right. |
| | 21 | Q. And what's the name of the client on the top? |
| | 22 | A. Dean. |
| | 23 | Q. And I'm going to flip to page one there. And if you just |
| | 24 | could tell the ladies and gentlemen what this document is. |
| | 25 | A. It's a 1997 tax return for Ward and Kumja Dean. |

4:52PM 1   Q.   And is that something you prepared for Mr. Dean?

2   A.   Yes, sir.

3   Q.   I'm going to direct your attention down to the bottom.   I

4   believe it's line 32.  Can you tell the ladies and gentlemen of

5   the jury, after you prepared the income tax owed and looked at

6   the adjusted gross income of Mr. Dean, what that figure is at

7   the bottom for his adjusted gross income for 1997?

8   A.   The adjusted gross income was $152,566.

9   Q.   And if I flip the page on that same document, I believe

10   it's in your writing, could you tell the ladies and gentlemen,

11   what was the balance due owed to the Internal Revenue Service?

12   A.   At 15 October, I calculated interest and penalties and

13   taxes due at 25,952.

14   Q.   So you used documents provided by Mr. Dean to create those

15   numbers?

16   A.   Yes, sir.

17           MR. GOLDBERG:   Your Honor, if I may quickly approach

18   the witness once again?

19           THE COURT:   Yes, sir.

20   BY MR. GOLDBERG:

21   Q.   Sir, I'm going to show you what's been marked as ITR-1997

22   and ask you to take a quick look at it, and let me know when

23   you have completed it.

24   A.   Okay.

25   Q.   Thank you, sir.

4:54PM 1        MR. GOLDBERG:  And, Your Honor, if I may ask for quick

2    permission to use the screen once again?

3        THE COURT:  What's the number of that exhibit?

4        MR. GOLDBERG:  ITR-1997.

5    BY MR. GOLDBERG:

6    Q.  Sir, is this a 1997 1040-EZ for tax purposes?

7    A.  Yes, sir.

8    Q.  And what's the name on the top?

9    A.  Ward Dean.

10   Q.  And did you prepare this form for Mr. Dean?

11   A.  No.

12   Q.  And what year is this form?

13   A.  1997.

14   Q.  And could you tell the ladies and gentlemen of the jury

15   what the number is on line 12, the amount that Mr. Dean put he

16   owed?

17   A.  Zero.

18   Q.  Now, I know this is a silly question, but does that number

19   differ from $25,952?

20   A.  Yes, sir.

21   Q.  Did you prepare that ITR-1997 for him?

22   A.  No, sir.

23   Q.  Around the mid-1990's, say around 1995, did you get the

24   impression that Mr. Dean didn't feel that the tax code was

25   fair?

4:56PM 1  A.  Yes, sir.

2        MR. GOLDBERG:  Your Honor, if I may briefly approach

3  once again?

4        THE COURT:  Yes, sir.

5        MR. GOLDBERG:  Thank you.

6  BY MR. GOLDBERG:

7  Q.  Sir, I'm going to show you what's been marked as JG-1995,

8  and ask you to quickly look through it and let me know when

9  you've completed it, sir.

10  A.  Okay.

11  Q.  Thank you, sir.

12        MR. GOLDBERG:  Your Honor, if the Court will indulge

13  me, if I may once again use the screen.

14        THE COURT:  What is the number of that exhibit?

15        MR. GOLDBERG:  Government's Exhibit JG-1995.

16  BY MR. GOLDBERG:

17  Q.  Sir, do you recognize this exhibit?

18  A.  Yes, sir.  It's a return that I prepared.

19  Q.  For 1995?

20  A.  Yes, sir.

21  Q.  Who was it prepared for?

22  A.  Ward and Kumja Dean.

23  Q.  And did you -- I want to show you one of the pages here,

24  and I apologize if I have to hold it down.  Is that your

25  writing?

| 4:58PM | 1 | A. | That's my writing, yes.  It is my writing. |
| | 2 | Q. | Okay.  And can I ask you to read this line? |
| | 3 | A. | You'd translate that a telephone call from Dean, although |
| | 4 | | that's admitted, "drop kids off tax return." |
| | 5 | Q. | And the next line? |
| | 6 | A. | "Potential tax protestor or looking for a hard way out of |
| | 7 | | the tax system." |
| | 8 | Q. | So Mr. Dean had told you to take his children off of his |
| | 9 | | tax return? |
| | 10 | A. | Yes, sir. |
| | 11 | Q. | And you thought he was maybe being a tax protestor? |
| | 12 | A. | Say that again. |
| | 13 | Q. | And you thought he was a tax protestor at that time? |
| | 14 | A. | Well, from some things that he told me at that time, I was |
| | 15 | | under the impression that, you know, he was a tax protestor or |
| | 16 | | becoming one. |
| | 17 | Q. | Did you ever tell Mr. Dean that it was okay to remove his |
| | 18 | | children from his tax returns? |
| | 19 | A. | No, I did not. |
| | 20 | Q. | Did you ever instruct him that it was okay to file with |
| | 21 | | zeros on his income tax returns? |
| | 22 | A. | No, sir. |
| | 23 | Q. | Did you ever instruct him to actually file zeros on his |
| | 24 | | income tax returns? |
| | 25 | A. | Say that again. |

4:58PM 1   Q. Did you actually ever instruct him to, in fact, file zeros,

2   straight zeros on his income tax returns?

3   A. No, sir.

4         MR. GOLDBERG: Your Honor, at this time I have nothing

5   further of Mr. Graham.

6         THE COURT: Ladies and gentlemen, this is the

7   opportunity for defense counsel to cross-examine the witness.

8         Mr. Becraft.

9                  CROSS-EXAMINATION

10  BY MR. BECRAFT:

11  Q. Mr. Graham, I believe you said on direct that the first

12  time that you prepared a tax return for Dr. Dean was for 1985;

13  is that correct?

14  A. It probably was, although it could have been 1984 when I

15  was working for another firm.

16  Q. Okay. Close enough. What were the circumstances under

17  which you and Dr. Dean met for the first time?

18  A. I really don't remember. I'm going to assume that he was a

19  referral from another military client.

20  Q. So that would have happened sometime in maybe late '85,

21  maybe sometime even in '84?

22  A. Yes, sir.

23  Q. Do you know what Dr. Dean was doing at that time?

24  A. At that time I believe he was the surgeon for Special

25  Operations Detachment Delta.

5:00PM  1    Q.   Delta Force?

      2    A.   Yes, sir.

      3    Q.   Flight surgeon?

      4    A.   I don't know if he was a flight surgeon or not.  I know he

      5    was a surgeon for them.

      6    Q.   Okay.  Were you in the service at that time?

      7    A.   No.

      8    Q.   When did you leave?

      9    A.   I retired on 1 November 1983.

     10    Q.   So from '85, maybe '84, all the way through the end of the

     11    '80s, you prepared returns for Dr. Ward Dean?

     12    A.   Yes, sir.

     13    Q.   You were up in Fayetteville, North Carolina, and he was not

     14    in North Carolina?

     15    A.   Part of the time he was, and then he -- I think he moved to

     16    California, and then he wound up in Pensacola.  I don't recall

     17    the dates of all that.

     18    Q.   Okay.  So the only time that you have -- the two of y'all

     19    would have lived in close proximity, but -- it would be

     20    whatever time that he was living in North Carolina?

     21    A.   Yes, sir.

     22    Q.   But you had recalled, there was a time that he was living

     23    in the late '80s out in California; is that about right?

     24    A.   I'm not sure of the dates, but I know he got out of the

     25    Army and went to California.

5:01PM 1  Q.  All right.  And then thereafter, you knew that he was down

2  here in Pensacola?

3  A.  Yes, sir.

4  Q.  Okay.  So when he came to Pensacola -- when he was out

5  there in California, he was using you, but when he moved to

6  Pensacola, he began -- he was still using you to prepare his

7  returns?

8  A.  Yes, sir.

9  Q.  When was it that this change happened?  You know, the

10  government just showed a minute ago, Mr. Goldberg, flashed on

11  the screen and had this document up there.  We didn't get a

12  date for that document that memorializes some notes to yourself

13  about Dr. Dean beginning to change.

14  A.  That would have been in 1986 when I did the 198 -- or the

15  1995 tax return.  It would have been '96.

16  Q.  All right.  So he would be living down here in Florida, and

17  he would be communicating with you either by fax or by phone,

18  correct?

19  A.  Or letter, yes.

20  Q.  So he definitely wouldn't travel up there?

21  A.  No.

22  Q.  So the only contact that you had with him when he was

23  living down here in Florida would be, you know, at tax time,

24  and it would be by phone?

25  A.  Right.

5:02PM 1   Q.  Okay.  Did he -- how many conversations did you have with

2   him over the phone?

3   A.  I don't recall.

4   Q.  Okay.  So you draw the conclusion that for '95, he asked

5   that his children be not claimed as dependents?

6   A.  Yes.  He also indicated -- he sent me some stuff on tax

7   protest, and it's attached to that particular tax return.  And

8   he sent it to me after I finished the return, if I remember

9   right.

10   Q.  Okay.

11         MR. BECRAFT:  One moment, Your Honor.

12   BY MR. BECRAFT:

13   Q.  So he sent to you a letter that he wrote to -- and it's in

14   this Exhibit JG-1995, the return that you prepared for '95.  I

15   presume that this particular exhibit is all of your notes

16   regarding the preparation of this particular return?

17   A.  There at the end of the return, yes.

18   Q.  Okay.  But then you also stuck in the file for that year, a

19   letter that he had written?

20   A.  Some stuff he sent me up after we had our conversation

21   about him dropping the kids off the return.

22   Q.  Okay.  Was the purpose of dropping the kids off the return

23   because he had some objection to them having Social Security

24   numbers?

25   A.  That may have been the case.  I think he said something

5:03PM 1  along the lines that if the kids -- if he doesn't put the kids

2  on the return, their Social Security numbers wouldn't be in the

3  system, or something like that.

4  Q.  All right.  But then this other thing that caused you to

5  believe that he might be becoming a tax protestor was this

6  other document that appears in this particular exhibit, and

7  it's a letter to Congressman Joe Scarborough, right?

8  A.  And I think there is something else in there, too.

9  Q.  All right.  This letter to Dr. Joseph Scarborough, did you

10  sit down and read it?

11  A.  I haven't reread it.  I read it at the time he sent it to

12  me.

13  Q.  Does it deal with legal matters?

14  A.  I can't recall.

15  Q.  Okay.

16       MR. BECRAFT:  May I approach the witness, Your Honor?

17       THE COURT:  Yes, sir.

18  BY MR. BECRAFT:

19  Q.  I just handed to you Government's Exhibit JG-1995.  Can I

20  get you to turn back to that letter?  And it's a part of that

21  exhibit.  It should be a letter dated September the 25th, 1996,

22  to Congressman Joe Scarborough.

23  A.  Right.  I have it.

24  Q.  Okay.  Can you look at that and see if it refreshes your

25  recollection?  Did you read it at the time that he sent it to

5:05PM 1 you?

2 A. Yes.

3 Q. Would you have received it and read it sometime in the

4 latter part of 1996?  It bears the date of September 25th, '96.

5 A. All right.  I finished this tax return around 11 October,

6 and I probably got this after that and read it and put it with

7 his '96 tax -- '95 tax return.  And, you know, this is all

8 classic tax protestor stuff.

9 Q. All right.  He has a memo attached to a letter that he sent

10 to Congressman Joe Scarborough.  The memo is uncertainty of the

11 federal tax laws?

12 A. Yes, sir.

13 Q. And it looks like that there are quotes from cases in this

14 letter; is that correct?

15 A. From who?

16 Q. Cases, court cases, reported court cases.

17 A. Now I see a few referenced in here.

18 Q. Okay.  Well, the first page do you see a case cited in the

19 second paragraph, United States against Kritzer?

20 A. Yes.

21 Q. Okay.  And below that quote, do you see a bunch of other

22 cases?  Do you know what -- Smith versus Jones, that's the

23 title of the name of a case.  Do you see names of cases there?

24 A. You say Smith versus Jones?

25 Q. No, no.  That was my explanation.  Can you see things like

5:06PM  1  United States against Malice, United States against Dalstrom?

2  A.  Yes.

3  Q.  Okay.  Is it your understanding that those are cites to

4  court cases?

5  A.  Yes, sir.

6  Q.  Okay.  And throughout -- if you look throughout this

7  particular letter, you can see that he is citing court cases,

8  correct?

9  A.  That's correct.

10  Q.  And, in fact, if you take a look at page number four, it

11  looks like there could be cites to maybe 20 or 30 cases; is

12  that correct?

13  A.  There are several on there, yes.

14  Q.  All right.  And virtually every page there is at least a

15  minimum of five, ten, maybe 15 court cases cited on each page;

16  is that right?

17  A.  I don't know if it's that, you know.  There are court cases

18  cited here, yes.

19  Q.  All right.  Have you read any of those court cases?

20  A.  No.

21  Q.  Isn't the general thrust of this letter that he's wrote his

22  congressman that the courts of this country have been unable to

23  make a determination as to the constitutional classification of

24  an income tax?

25  A.  I have no idea.

5:07PM 1  Q.  Well, can I get you to read for the jury the third

2  paragraph looking at the Joe Scarborough letter?  Can you read

3  that paragraph for us, please?

4  A.  In the letter?

5  Q.  Yes.

6  A.  The third paragraph?

7  Q.  Yes.

8  A.  "It appears that Congress can adopt two types of

9  constitutional taxes, one class B and direct property taxes,

10  and the other class B and indirect taxes.  Primary indirect tax

11  appears to be an excise tax.  However, neither of these classes

12  of taxes may be imposed on the same object.  Nevertheless,

13  American courts have concluded at various times that the

14  federal tax is both an excise indirect tax and a direct tax,

15  which is an impossibility.  When the courts appear to be so

16  confused about the tax laws, how can we mere citizens be

17  expected to understand them?"

18  Q.  What you read is a part of a letter that's signed by

19  Dr. Ward Dean and sent to Congressman Joe Scarborough?

20  A.  I would presume it does, but it's not signed.  It's on his

21  letterhead.

22  Q.  So you formed a conclusion that Dr. Dean was looking into

23  tax protest literature from the simple fact that he wrote a

24  letter to his congressman pointing out a whole bunch of court

25  cases, and you really don't know anything about what those

5:09PM 1  court cases have to say?

2  A.  I wrote the note on tax protestor before I saw this.  When

3  somebody says they want to drop their kids off a tax return

4  because they want them to disappear from the system, I perceive

5  that as tax protesting.

6  Q.  Answer my question, please.

7  A.  I didn't -- give me the question again, then.

8  Q.  Okay.  At some time after September 25th of 1996, you saw

9  this letter from Ward Dean to Congressman Joe Scarborough from

10  Washington, D.C.  Did you look over the letter?

11  A.  Yes.

12  Q.  You saw that it had a whole bunch of court cites on there?

13  A.  Yes, sir.

14  Q.  You saw that it's -- paragraph -- the third paragraph of

15  the letter read just like the way you read it to the jury a

16  moment ago, right?

17  A.  That's true.

18  Q.  And without any investigation of what the court cases had

19  to say, you just drew a conclusion that Dr. Dean might be

20  exploring some tax protestor stuff, and you didn't make a

21  determination -- you couldn't answer his question as to whether

22  the courts really could not make a determination as alleged by

23  Dr. Dean in his letter here?

24  A.  Now I don't understand the question.

25  Q.  Okay.  All right.  Good.  Let me rephrase that.  He sent

5:10PM 1  this to you for some purpose?

2  A.  I honestly don't know why he sent it to me.

3  Q.  Okay.  Did you have a conversation with him over the phone

4  about this letter?

5  A.  Not about the letter when we were discussing taking the

6  kids off the tax return.  He sent me that stuff afterward.

7  Q.  Okay.  So the two of y'all didn't have any phone

8  conversation or any conversation whatsoever about the letter?

9  A.  Not that I recall.

10  Q.  All right.

11          MR. BECRAFT:  Nothing further, Your Honor.

12          THE COURT:  All right.  Ladies and gentlemen, the side

13  calling a witness has an opportunity for redirect examination.

14          Mr. Goldberg.

15          MR. GOLDBERG:  Your Honor, may I approach the witness

16  to retrieve the exhibit?

17          THE COURT:  Yes, sir.

18          MR. GOLDBERG:  Thank you.

19          Thank you, sir.

20                    REDIRECT EXAMINATION

21  BY MR. GOLDBERG:

22  Q.  Mr. Graham, are you a lawyer?

23  A.  No, sir.

24  Q.  Are you Joe Scarborough?

25  A.  No.

5:11PM 1  Q.  You're just a certified public accountant following the

2  law?

3  A.  Yes, sir.

4  Q.  Did the defendant consult you prior to filing zeros all

5  over his tax returns?

6  A.  Say that again.

7  Q.  Did the defendant consult you and ask you whether or not it

8  was a good idea to file zeros on his tax return?

9  A.  No, sir.

10          MR. BECRAFT:  Your Honor, I object.  That's beyond the

11  scope of cross --

12          THE COURT:  Overruled.

13          MR. BECRAFT:  -- to ask those questions about that.

14          MR. GOLDBERG:  May I continue, Your Honor?

15          THE COURT:  Yes, sir.

16  BY MR. GOLDBERG:

17  Q.  I'm sorry.  Did you answer my question?  Did he consult you

18  before filing zeros on his return?

19  A.  No, sir.

20          MR. GOLDBERG:  If it pleases the Court, Your Honor,

21  I'd like to use the screen one more time.

22          THE COURT:  Place it on there.

23          MR. GOLDBERG:  Government's Exhibit JG-1995.

24  BY MR. GOLDBERG:

25  Q.  Now, sir, you heard defense counsel asking whether you

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

5:12PM 1   thought he was a tax protestor based on that 1996 letter.  Do

2   you remember when he asked you that?

3   A.  Yes.

4   Q.  What's the date on your notes from the phone call regarding

5   the tax protestation, what's the year?

6   A.  It pertained to the '95 return, and it would have been on

7   either 10/11 or 10/12 when I was working on the return when he

8   asked me to take the kids off of it.

9   Q.  So it would have been prior to the 1996 letter?

10  A.  Yes.

11          MR. GOLDBERG:  Your Honor, I have nothing further.

12          THE COURT:  All right.  You may step down.

13          And your next witness.

14          MR. DAVIES:  Your Honor, at this point the government

15  has a number of exhibits to offer.  The government would offer

16  Government's Exhibit AIT-1, which are certified business

17  records from AIT, Inc., regarding the defendant's website.  The

18  government would offer Government's Exhibit C-Alabama,

19  C-Florida and C-Georgia, which is IRS correspondence to the

20  defendant from the IRS office in Alabama, Florida and Georgia,

21  respectfully.

22          The government would offer Government Exhibit DFAS-1,

23  DFAS-2 and DFAS-3, which are certified business records from

24  the Department of Finance and Accounting Service.  The

25  government would offer DL-1, which is a copy of the defendant's

5:13PM  1  driver's license with a signature. The government would offer
        2  EF-1, which are the certified business records from Equifax.
        3  The government offers EX-1, which are the certified business
        4  records from Experian. The government offers F -- Government
        5  Exhibit FFI-1, which are certified business records from First
        6  Fitness International. The government offers FUB-1, which are
        7  certified records from Wachovia Bank, formerly known as First
        8  Union Bank.

        9         The government would offer Government's Exhibit GPC-1,
       10  which is the application and certified business record from
       11  Green Point Credit. The government would offer Government's
       12  Exhibit Instructions-1997 through Instructions-2002, which are
       13  IRS 1040 instruction booklets for the respective years. The
       14  government would offer LEP-1, LEP-2 and LEP-3, which are
       15  certified business records from Life Enhancement Products.

       16         The government would offer Government's Exhibit
       17  MBNA-1, which are certified business records from MBNA Bank.
       18  The government would offer Mortgage Interest-1, which is a
       19  certified -- which is a domestic public document under seal
       20  regarding the defendant's mortgage interest. The government
       21  would offer Government's Exhibit Order-1, which is a certified
       22  copy of an order from the United States District Court of the
       23  Northern District of Florida. The government would offer
       24  Government's Exhibit PNC-1, which is certified records from the
       25  PNC Bank.

5:15PM
1          The government would offer Government's Exhibit
2   RE-Tax-1, which are certified records regarding real estate
3   taxes.   The government would offer Government's Exhibit SP-1,
4   which are certified records -- certified business records of
5   Smart Publications.   The government would offer Government's
6   Exhibits TA-1991 through TA-2002, which are certified domestic
7   public documents under seal, IRS records.   The government would
8   offer Exhibit TU-1, which are certified business records from
9   Trans Union.   The government would offer Government Exhibit
10   USGI-1, which are certified business records from Global
11   Investors.

12          And the government would offer Government's Exhibits
13   VRP-1 through VRP-6, which are certified business records of
14   Vitamin Research Products.   And, finally, the government would
15   offer WD-FOIA-1, which are certified domestic public documents
16   under seal of the defendant's Freedom of Information Act
17   requests.   And the government would offer Government's Exhibit
18   WFHM-1, which is certified public -- certified business records
19   of Wells Fargo Home Mortgage.

20          MR. BECRAFT:   We have objections to those, Your Honor,
21   and it probably would be best to take them up at a different
22   time.

23          THE COURT:   Can you proceed with any of these with
24   this witness?

25          MR. DAVIES:   Your Honor, I can proceed with this

5:16PM 1  witness at this time.

2           WAYNE E. JACKSON, GOVERNMENT'S WITNESS.

3           THE CLERK:  Sir, do you solemnly swear that the

4  testimony that you shall give will be the truth, the whole

5  truth and nothing but the truth, so help you God?

6           THE WITNESS:  Yes, I do.

7           THE CLERK:  Be seated.  State your full name and spell

8  your last name.

9           THE WITNESS:  Wayne E. Jackson, J-a-c-k-s-o-n.

10          THE COURT:  All right.  Mr. Davies.

11                        DIRECT EXAMINATION

12  BY MR. DAVIES:

13  Q.  Good afternoon, Mr. Jackson.

14  A.  Good afternoon.

15  Q.  Would you tell the jury whether you're retired from

16  anywhere?

17  A.  Yes.

18  Q.  Where are you retired from?

19  A.  From the Internal Revenue Service.

20  Q.  And how long have you been retired from the IRS?

21  A.  One year and four months.

22  Q.  What was your position at the IRS?

23  A.  Internal Revenue agent.

24  Q.  And how long were you a revenue agent with the IRS?

25  A.  Twenty-eight years.

5:17PM 1    Q.  And would you tell the jury what a revenue agent does?

2    A.  Yes, sir.  A revenue agent examines tax liabilities of

3    individuals and businesses to make sure the proper amount of

4    tax is paid.

5    Q.  And can you tell the jury in general the ways in which an

6    investigation of a person's tax liability could be assigned to

7    a revenue agent like you to investigate?

8    A.  Yes, sir.  They come in different ways.  Usually the most

9    obvious way is from the service center.  They look at the tax

10   returns and decide if something looks out of line.  And if so,

11   they send it to the district office.  The district office then

12   assigns it to the local office, who does the examination.

13       Some of the audits also are from referrals, such as

14   collection referral.  The collection division is in charge of

15   collecting the proper amount of tax, and they are also

16   responsible for seeing that the correct tax returns are filed.

17   This is for the accounts they are working on.  And if the tax

18   returns are not filed, the collection division refers that over

19   to an examination division, where the revenue agents do the

20   examination.

21   Q.  Revenue Agent Jackson, when a revenue agent examines a

22   person's tax liability, is it a civil examination or a criminal

23   examination?

24   A.  Civil examination.

25   Q.  Do you know Tanya Burgess?

5:19PM  1    A.   Yes, I do.

     2    Q.   Do you see her here in court?

     3    A.   Yes.  She's seated behind you.

     4    Q.   Is Tanya Burgess in civil investigation or criminal

     5    investigation?

     6    A.   Criminal investigation.

     7    Q.   But as a revenue agent, your role is civil?

     8    A.   Civil.

     9    Q.   Do you know who Ward Dean is?

    10    A.   Yes, sir, I do.

    11    Q.   And if you see him in court, would you identify him for the

    12    record?

    13    A.   Yes.  He's the second gentlemen here.

    14         MR. DAVIES:  May the record reflect --

    15         MR. BECRAFT:  Stipulated.

    16         MR. DAVIES:  -- that the witness has identified the

    17    defendant, Your Honor?

    18         THE COURT:  Granted.

    19    BY MR. DAVIES:

    20    Q.   Did there come a time you began examining the defendant's

    21    tax liability for the tax years of 1997 through 2000?

    22    A.   Yes, sir.  I started July the 27th, 2001.

    23    Q.   During the course of your examination, did you issue any

    24    summonses to entities to attempt to obtain records regarding

    25    income they paid to the defendant?

5:19PM 1 A. Yes, sir.  I issued summonses to his employer, the defense

2 retirement foundation and also to banks that Dr. Dean used.

3 Q. When you issue a summons, do you keep any record of that

4 fact?

5 A. Yes, sir, we keep a copy of it.

6    MR. DAVIES:  Your Honor, I have some exhibits that are

7 not in evidence.  Do you prefer me to publish them to the

8 witness on the screen turned off for the jury?

9    THE COURT:  Yes, sir.  If he can identify them over

10 the screen, it would be simpler.

11 BY MR. DAVIES:

12 Q. Can you see that there on the screen in front of you?

13 A. Yes, sir, I can see that.

14 Q. And it's labeled for identification Government's Exhibit

15 Summons-1.  I'm showing you the first page on the screen, but

16 have you seen this whole exhibit and all of its pages before?

17 A. Yes, sir, I have.

18 Q. And what is that exhibit?

19 A. It's a summons issued to Vitamin Research Products, Inc.

20 Q. And who issued that summons?

21 A. I issued the summons.

22 Q. And behind this, are all of these true and correct copies

23 of summonses you issued in January and February of 2002 along

24 with your attached notes of service?

25 A. Yes, sir.

5:21PM 1    Q.   And were all of the summonses in Government's Exhibit

2    Summons-1 issued to further your and the Pensacola IRS's office

3    examination of the defendant's tax liability?

4    A.   Yes, sir.

5         MR. DAVIES:   Your Honor, I'd offer Government's

6    Exhibit Summons-1.

7         MR. BECRAFT:   No objections, Your Honor.

8         THE COURT:   Summons-1 is admitted.

9         MR. DAVIES:   May I publish this to the jury, Your

10   Honor?

11        THE COURT:   Yes, sir.

12   BY MR. DAVIES:

13   Q.   And showing you the first page, Revenue Agent Jackson, as

14   the jury looks at it, who was that summons issued to?

15   A.   Vitamin Research Products, Inc.

16   Q.   And just to quickly go through the other parts of the

17   exhibit, who is that summons issued to?

18   A.   Defense Finance and Accounting Service.

19   Q.   And this summons here is to who?

20   A.   PNC Bank.

21   Q.   And is there also a summons to First Union National Bank?

22   A.   Yes, sir.   It's on the screen.

23   Q.   What's this company that you issued a summons to?

24   A.   Yes, sir.   MBNA, Pennsylvania.

25   Q.   And, finally, who is the last summons to?

5:22PM 1    A.   Life Enhancement Products, Inc.

2    Q.   And let me -- this is in somewhat small type, so I'll show

3    it and scroll so the jury can see.  If you go down to the

4    bottom where it says "Original," what does that mean?

5    A.   That means the IRS agent that sent out the summons keeps

6    that copy of it.

7    Q.   So this is the copy you kept?

8    A.   Yes, sir.

9    Q.   And whose name is that there?

10   A.   That is my name, Wayne Jackson.

11   Q.   It's a little hard to read, but the body of it, is that the

12   summons for the record that you're wanting this company to

13   produce to you?

14   A.   Yes, sir.

15   Q.   And is there a summons just like this that -- this being

16   your copy, is there a summons just like this that you would

17   have sent to Vitamin Research Products?

18   A.   Yes, sir.

19   Q.   And what about the defendant, would the defendant get a

20   copy of the summons?

21   A.   Yes, sir.  He would get an exact copy.

22   Q.   And showing you page two of Government's Exhibit Summons-1,

23   does that reflect when you served the summons on Vitamin

24   Research Products?

25   A.   Yes, sir, it does.

5:24PM 1  Q.   What was the date?

2  A.   January 10, 2002.

3  Q.   And down here in the middle of the page, who is the noticee

4  that you gave notice to?

5  A.   Mr. Ward Dean.

6  Q.   And what's the date?

7  A.   The same date, January 10th, 2002.

8       MR. DAVIES:   Your Honor, I have Government's Exhibit

9  Summons-2, which is not in evidence yet.  I'd like to show to

10  the witness.

11  BY MR. DAVIES:

12  Q.   I'm showing you Government's Exhibit Summons-2.   I'm

13  showing you the first page on the overhead, Revenue Agent

14  Jackson.

15  A.   Yes, sir.

16  Q.   But have you seen the whole exhibit and all of its pages

17  before?

18  A.   Yes, sir.

19  Q.   And what is this exhibit, Government's Exhibit Summons-2?

20  A.   This is a summons showing the original top page of the

21  summons to be kept by the IRS.

22  Q.   And is this blank?

23  A.   Yes, sir.

24  Q.   Okay.   And will this -- and does it contain all of the

25  pages, the pages you would keep and the pages that would go to

5:25PM 1    the company being summonsed and the defendant noticed here?

     2    A.  Yes, sir.

     3    Q.  And would this help you explain with regard to the summons

     4    issued in this case what it is you keep with regard to the

     5    summons and what it is the other entities actually receive?

     6    A.  Yes, sir.

     7           MR. DAVIES:  I offer Government's Exhibit Summons-2

     8    into evidence, Your Honor.

     9           MR. BECRAFT:  No objection, Your Honor.

    10           THE COURT:  It's admitted.

    11    BY MR. DAVIES:

    12    Q.  And just showing you page one, is this the copy of the page

    13    that you would keep?

    14    A.  Yes, sir.

    15    Q.  And page two, this is a blank of the page of what we looked

    16    at for Vitamin Research Products --

    17    A.  Yes, sir.

    18    Q.  -- that you would keep?

    19    A.  Yes, sir.

    20    Q.  And turning to page three, who gets this copy of the

    21    summons?

    22    A.  Part A is given to the person summonsed.

    23    Q.  So in the first example, that would be Vitamin Research

    24    Products?

    25    A.  Yes, sir.

5:26PM 1    Q.   And then behind this first page, are there three other

2    pages of information that go to the party being summonsed?

3    A.   Yes, sir.

4    Q.   And then going to the page of the exhibit labeled Part C,

5    who does that go to?

6    A.   In this case, this would go to Mr. Ward Dean.

7    Q.   So the jury can see the whole thing, Mr. Dean also gets a

8    copy of the summons?

9    A.   Yes, sir.

10    Q.   And the three pages of information behind it?

11    A.   Yes, sir.

12    Q.   Revenue Agent Jackson, did there come a time when the

13    defendant sent you a pack of letters that he had sent to some

14    of the entities to whom you had issued IRS summonses?

15    A.   Yes, sir, there was.

16          MR. DAVIES:   Your Honor, I have another exhibit not in

17    evidence, which is Government's Exhibit WJ.

18    BY MR. DAVIES:

19    Q.   I'm showing you Government's Exhibit WJ, Revenue Agent

20    Jackson.   Is this exhibit a true and correct copy of the pack

21    of letters the defendant sent to you?

22    A.   Yes, sir.

23          MR. DAVIES:   Your Honor, I'd offer Government's

24    Exhibit WJ, for Wayne Jackson.

25          MR. BECRAFT:   No objection, Your Honor.

5:27PM 1

THE COURT: It will be admitted.

2        But, Mr. Davies, this is the time that I promised the

3   jury we'd never go past two hours, and we're approaching that.

4   So we're going to stop now and resume tomorrow morning at 8:30.

5        Again, I do remind you of my directions not to discuss

6   this case among yourselves or anyone else or allow them to talk

7   to you about the case or speak of the case in your presence.

8   Remember the other directions to make no inquiry or

9   investigation on your own about these matters, and avoid any

10  news reports or anything else that would bear upon the case in

11  any way, and certainly wait until all the evidence has been

12  heard and you've received the arguments of the attorneys and

13  received your instructions on the law before attempting to form

14  any opinion concerning the merits of the case.

15       And another point I do want to make is that you will

16  have all of this evidence that's admitted in the trial with you

17  for your careful and detailed study during your deliberations.

18  So don't be concerned if it's not shown to you at all or just

19  for a short period or whatever, because you will have it for

20  your study as long and as careful as you might wish.

21       So any questions as to schedule or expectations?  If

22  not, then thank you very much for a good day, and we'll excuse

23  you at this time and ask for your return at 8:30 tomorrow

24  morning to the jury room.

25       (Jury out.)

5:29PM 1    THE COURT:  And, Mr. Jackson, you may be excused, but

2    I would direct your return back to the witness stand at 8:30

3    tomorrow morning.

4         THE WITNESS:  Yes, sir.

5         THE COURT:  All right.  And do be seated.  And what

6    are the objections to the exhibit, Mr. Becraft?

7         MR. BECRAFT:  Well, Your Honor, this is one of those

8    problems that I kind of inherited coming into this case kind of

9    late.  It appears to me -- you know, not that I'm opposed to

10   stipulations.  I think stipulations move cases along a lot, and

11   I think the jury appreciates it.  But there were stipulations

12   in this case.  However, Mr. Davies has read off some of his

13   exhibits that I don't think that Dr. Dean agreed to stipulate

14   to.  One that he read off -- I think the exhibit number was

15   SP-1, Smart Publications, VRP, which would be Vitamin Research

16   Products, and Life Enhancements, that would be the exhibits

17   that I think they are labeled LE.

18        MR. DAVIES:  For the record, they are LEP.

19        MR. BECRAFT:  LEP.  Okay.  Those are exhibits that

20   Dr. Dean tells me that he did not stipulate to.  There is

21   obviously some stipulation, but those particular exhibits were

22   not stipulated to by Dr. Dean.

23        THE COURT:  So those are the ones that you have

24   objection to?

25        MR. BECRAFT:  Yes, Your Honor.

5:31PM 1     THE COURT: And that was LEP-1, 2 and 3. And what

2 else was the other one?

3     MR. BECRAFT: The VRP.

4     MR. DAVIES: VRP-1 through 6 and SP-1, if I'm

5 understanding the objection.

6     THE COURT: VRP and SP?

7     MR. DAVIES: SP-1, Your Honor.

8     THE COURT: All right. So I take it then there are no

9 objections to the others that have been offered?

10     MR. BECRAFT: Well, I'd like to know what the

11 government is moving the 1040 instruction booklets in for '97

12 through 2002. I would object to that. I don't -- you know,

13 that's a publication. It seems like to me from the opening

14 statement that Mr. Davies gave to the jury, he wants to use

15 those publications, I guess, to in essence tell the jury the

16 law. If that's the purpose of them, I would object. You know,

17 I don't think a manual is something that's to be considered the

18 law. You know, I have no doubt that they are legitimate 1040

19 instruction booklets. I just think they are irrelevant for the

20 proof.

21     THE COURT: Let me rephrase my statement then. Are

22 these other exhibits part of the stipulation that have been

23 agreed to in this case?

24     MR. BECRAFT: I believe so, Your Honor.

25     THE COURT: Well, they will be admitted.

5:32PM 1    MR. BECRAFT: Oh, you mean the 1040 instruction

2    booklets?

3    THE COURT: Right. They are not listed there, and

4    they are numbers you gave me that you had some concern.

5    MR. DAVIES: No, Your Honor. The 1040 instruction

6    booklets are not stipulated to. The stipulation comes from

7    some business records.

8    MR. BECRAFT: We agree with whatever was signed in the

9    way of a previous stipulation.

10    THE COURT: That's what I'm trying to get, so we can

11    mark them off and deal only with those that there are

12    objections.

13    MR. BECRAFT: Well, Mr. Davies offered the ones that

14    are rather en masse, combining them with others that have not

15    been stipulated to.

16    MR. DAVIES: Well, Your Honor, I resent Mr. Becraft

17    saying I'm confusing him. I mean, I gave him a witness list in

18    May, and he's obviously never looked at it. And I listed them,

19    went through them. And if you look at the stipulations to see

20    what I went through, you can see what was stipulated to, and

21    I'll tell the Court what was stipulated to. It was -- and this

22    is Document 52 in the record. Government's Exhibit AIT-1 was

23    stipulated to. Government's Exhibit DFAS-1 through DFAS-3 was

24    stipulated to. Government's Exhibit EF-1 was stipulated to.

25    Government's Exhibit EX-1 was stipulated to. Government's

5:34PM   1    Exhibit FFI-1 was stipulated to.  Government's Exhibit FUB-1
2    was stipulated to.  Government's Exhibit GPC-1 was stipulated
3    to.  Government's Exhibit JG-1991 through 1997, which are
4    already in evidence, were stipulated to.  Government's Exhibit
5    MBNA-1 was stipulated to.  Government's Exhibit PNC-1 was
6    stipulated to.  Government's Exhibit TU-1 was stipulated to.
7    Government's Exhibit USGI-1 was stipulated to.  And
8    Government's Exhibit WFHM-1 was stipulated to.

9         And, Your Honor, just so the record is clear if the
10   Eleventh Circuit is reading this, I provided a bench memo on
11   May 5th, 2005, Document 37, where I told the Court and told
12   defense counsel that I was going to do this, that I was going
13   to offer all these records, and I gave the basis for all the
14   records.  And the records that were not stipulated to are
15   admissible for the reasons set forth in my bench memorandum,
16   Document 37.  Basically they're all either domestic public
17   documents under seal, in the case of IRS instruction booklets,
18   they're official publications admissible under Rule 9025, and
19   then there are three sets of business records that are
20   certified with the business records certificate and are
21   admissible pursuant to the Federal Rule of Evidence 803(6) and
22   902(11).

23        So for the reasons in my bench memo, all the items he
24   did stipulate to are admissible as self-authenticating
25   documents.

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

5:35PM 1      THE COURT:   That was going to be my next question.
2   Assuming that Mr. Davies has listed them correctly,
3   authenticated with the seal and business records with
4   authentication, what is the objection?

5      MR. BECRAFT:   Your Honor, for what he read off that
6   was subject to the stipulation which I wrote down, we don't
7   have any problem with that.   It seems like to me that the
8   government is trying to bring into this case some business
9   records without laying a foundation for -- they haven't been
10   authenticated, and the three that haven't been authenticated
11   are the Smart Publication documents, the Vitamin Research
12   documents and Life Enhancement documents.   I don't know of any
13   procedure where you get somebody to just execute an affidavit
14   saying, hey, here are my business records, without bringing
15   somebody to court to testify about the keeping of the business
16   records and showing that it qualifies as a -- under a business
17   records exception under Rule 803.

18      MR. DAVIES:   Your Honor, Rule 902(11) specifically
19   provides for that procedure, and I gave him -- just so the
20   record is clear, I gave him -- not only did I file a bench memo
21   saying I was going to do this, in discovery I sent him a letter
22   saying that I was going to offer these business records with
23   the certificates, and I provided him with the certificates as
24   well as the records, told him I was going to offer the
25   certified business records under 803(6) and 902(11).   He's

5:36PM  1   known about that since May.

       2              THE COURT:  Are you not familiar with those rules?

       3              MR. BECRAFT:  Yes.  Yes, sir.

       4              THE COURT:  We've been using them for about a year

       5   now.

       6              MR. BECRAFT:  You can't get business records of a

       7   normal business offered into evidence by just an affidavit.

       8              THE COURT:  You can't?

       9              MR. BECRAFT:  No, you can't, Your Honor.  That's my

      10   understanding, you know.  You have to -- to authenticate a

      11   business record, you have to lay a foundation for the business

      12   record by calling somebody into court saying these are records

      13   of activities that we keep in the normal course of business by

      14   a party with actual knowledge at or about -- and the record is

      15   made at or about the time the event occurs.  You know, that's

      16   the foundation that gets laid for a business record.  You know,

      17   to say that there is some special rule under 803 or 902 -- you

      18   know, I looked at 902 just last week.  There is no way a

      19   business record can be self-authenticating, which is the

      20   subject of 902.

      21              MR. DAVIES:  Your Honor, Rule 902(11), I'm looking

      22   right at it, certified domestic records of regularly conducted

      23   activity.  It says you can do this.  The Court has been doing

      24   it since the rule came into effect.  All these business records

      25   I'm offering are certified business records.  And I gave notice

                        Gwen B. Kesinger, RPR, FCRR
                        United States Court Reporter

5:38PM 1   in a discovery and in a bench memo I was going to do this.

2        THE COURT: Quite frankly, that's my memory. I'll

3   admit I haven't studied the record, but I haven't had an

4   objection to it since the rule first came out and everybody

5   became familiar with it.

6        MR. BECRAFT: Well, I make my objections, Your Honor.

7   That's all.

8        THE COURT: Well, I want to satisfy your objection.

9   If you can show me where that rule does not apply, and it seems

10   to be clearly be aimed at that to keep from having to drag

11   people in to certify that's their record, that was the purpose

12   of the rule, then I'll hear you further.

13        MR. BECRAFT: Well, I've said all I can, Your Honor.

14   I came into this case in October, so --

15        THE COURT: And my next objection is that when he

16   gives it to you in May -- when I say "you," I'm not talking

17   about you personally, I'm talking about you the defense -- in

18   May, I have serious concern in the midst of trial objecting.

19        MR. BECRAFT: I just simply made an objection. You

20   know, Dr. Dean has talked to the people at Vitamin Research

21   Products. They received a subpoena previously. You know, I

22   was under the expectation that those witnesses would come in to

23   authenticate those business records. And my position is that

24   these particular business records could not be

25   self-authenticating under Rule 902. That's my objection.

5:39PM 1    THE COURT:  I'll reread the rule tonight, but I

2    suspect you're wrong, but to be certain.  Anything else?

3        MR. BECRAFT:  Nothing further, Your Honor.

4        MR. DAVIES:  No, Your Honor.

5        THE COURT:  And you are telling me, Mr. Davies, and I

6    assume you have nothing to say it ain't so, there are

7    affidavits of authentication of these business records, you

8    just object to that proceeding process.

9        MR. BECRAFT:  Yes, sir.  I don't doubt that there's --

10   you know, I've looked at this, that he's got an affidavit.

11       THE COURT:  All right, then.

12       MR. DAVIES:  Your Honor, just so the record is clear,

13   some of these records are public records, not business records.

14   And my bench memo sets out what is what.  And I have

15   certificates for all the business records.  And all the public

16   records that I mentioned, I have a blue ribbon copy which is a

17   certificate, too.

18       MR. BECRAFT:  I'm not objecting to public records

19   under seal, Your Honor.

20       THE COURT:  All right.  Anything else we need to do

21   today before 8:30 tomorrow?

22       MR. BECRAFT:  Not from the defense, Your Honor.

23       THE COURT:  All right.  We'll be in recess until 8:30.

24       (Proceedings adjourned.)

25

Gwen B. Kesinger, RPR, FCRR
United States Court Reporter

**5:40PM** 1

--------------------

2        I certify that the foregoing is a correct
         transcript from the record of proceedings
3              in the above-entitled matter.

4

5                                          12-23-05

6  Gwen B. Kesinger, RPR, FCRR          Date
   Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25